1  JON D. MEER (State Bar No. 144389)
   jmeer@seyfarth.com
2  SIMON L. YANG (State Bar No. 260286)
   syang@seyfarth.com
3  **SEYFARTH SHAW LLP**
   2029 Century Park East, 35th Floor
4  Los Angeles, California 90067-3021
   Telephone: (310) 277-7200
5  Facsimile: (310) 201-5219

6  LORIE E. ALMON (*admitted pro hac vice*)
   lalmon@seyfarth.com
7  **SEYFARTH SHAW LLP**
   620 Eighth Avenue, 32nd Floor
8  New York, New York 10018
   Telephone: (212) 218-5500
9  Facsimile: (212) 218-5526

10 Attorneys for Defendant
   THE PRUDENTIAL INSURANCE
11 COMPANY OF AMERICA, INC.

12            **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14                 **WESTERN DIVISION**

| | |
|---|---|
| 15  DOMINIQUE OSBORNE, on her own behalf and on behalf of a class of 16 similarly situated persons pursuant to F.R.C.P. 23 and 23 U.S.C. §216, and on 17 behalf of the General Public, | Case No. CV10-2465 JFW (CWx) *The Hon. John F. Walter* |
| 18                 Plaintiffs, | **DEFENDANT PRUDENTIAL INSURANCE COMPANY OF AMERICA, INC.'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| 19            v. | |
| 20  THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New 21 Jersey Corporation, | Date:            December 6, 2010 Time:            1:30 p.m. Courtroom:       16 |
| 22                 Defendant. | |
| 23 | Complaint Filed: April 5, 2010 Discovery Cutoff: March 1, 2011 24 Motion Cutoff: March 28, 2011 Pre-Trial Conf.: May 6, 2011 25 Trial Date: May 24, 2011 |

26

27

28

12850846v.4

1   TO PLAINTIFF, DOMINIQUE OSBORNE, AND HER COUNSEL OF

2   RECORD, TEEPLE HALL, LLP:

3        PLEASE TAKE NOTICE that Defendant Prudential Insurance Company of

4   America, Inc. ("Prudential") hereby submits the following Statement of

5   Uncontroverted Facts and Conclusions of Law in Support of Its Motion for

6   Summary Judgment as to the Complaint of Plaintiff Dominique Osborne

7   ("Plaintiff") as follows:

8   **I.**      **STATEMENT OF UNCONTROVERTED FACTS**

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 1.   Plaintiff worked for Prudential from August 2008 to July 2009. | 1.   Plaintiff's Depo., 11:20-12:4. <br><br> Q:   You started work on August 21st, 2008 and your employment ended on -- to July 17th, 2009, correct? <br><br> A:   I want to say it was before August 21st, but it in August. <br><br> Q:   August 2008, right? <br><br> A:   Yes. That's correct. <br><br> Q:   And your employment ended on July 17th, 2009, right? <br><br> A:   I'm not sure of the exact date, but I know it was in July. |
| 2.   While working for Prudential, Plaintiff worked at the Agoura Hills location. | 2.   Plaintiff's Depo., 12:5-8. <br><br> Q:   And during the time that you were working for Prudential, you worked at their Agoura Hills location, correct? <br><br> A:   Yes. That's correct. |
| 3.   The Agoura Hills call center had approximately 14 hourly employees that worked in the call center on the phone. | 3.   Plaintiff's Depo., 34:14-15, 19-22. <br><br> Q:   And at the call center where you worked, there were approximately 14 hourly employees? <br><br> A:   Well, there was more than 14 employees that worked in the call |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| | center. There was other people that did different things that were not all -- not everyone was on the phone. |
| 4. Some people at the Agoura Hills location handled claims; some people did not wear a headset; and some people handled administrative issues, paperwork, and correspondence. | 4. Plaintiff's Depo., 48:3-8, 11-13, 16, 18-20, 23.<br><br>Q: And some people were assigned to the activity of handling claims, correct?<br><br>A: Well, yes. There was people that -- that strictly were just doing claims, but you can also be on the phone working because we were always having to multi-task and work on claims as well.<br><br>Q: But there were some people who didn't wear a headset during some part of the day and they only worked on claims and didn't take any calls, right?<br><br>A: Yes. That's correct.<br><br>Q: And there were some people who also during some part of the day handled administrative issues, paperwork, correspondence, things like that?<br><br>A: Yes. That's correct. |
| 5. The employees handling calls wore headsets either talking to callers or waiting for callers. | 5. Plaintiff's Depo., 48:25-49:6.<br><br>Q: And these activities -- just to use shorthand so that we're both talking about the same thing, I'm going to refer to as "handling calls," and you understand those are the people who are wearing headsets and either talking to callers that come in or waiting for callers that come in. Is that a fair description of it?<br><br>A: Yes. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 6. Employees assigned to handle claims could be required to jump on the phones in the middle of doing a claim. | 6. Plaintiff's Depo., 49:7-10, 13-20.<br><br>Q: Okay. And people who are handling claims are not wearing a headset, they are handling the claims process and matching up the claims with the proper payments to be paid, correct?<br><br>A: I would have to disagree because if we got busy all of a sudden, everybody who was doing claims -- you could keep your headset on all day because it was unpredictable because of being a call center. So they could be required to jump on the phones in the middle of doing a claim. So everyone was -- the job that was trained to do claims was also trained to be on the phone at any moment's notice. |
| 7. Employees moved from handling calls to handling claims or to handling correspondence throughout the same day. | 7. Plaintiff's Depo., 51:2-5.<br><br>Q: People moved from handling calls to handling claims or to handling correspondence throughout the same day, right?<br><br>A: Yes. That's right. |
| 8. The job assignments at the Agoura Hills call center were in a constant state of change throughout the day depending on the call volume or claim volume.  If the call volume was particularly high, then more people were handling calls than if the call volume was particularly low.  People moved from handling calls to handling claims or to handling correspondence throughout the same day. | 8. Plaintiff's Depo., 50:19-51:5.<br><br>Q: And those three activities were in a constant state of change throughout the day depending on call volume or claim volume, correct?<br><br>A: Yes. That's correct.<br><br>Q: So if the call volume was particularly high, then more people were handling calls than if the call volume was particularly low, right?<br><br>A: Yes. That's right.<br><br>Q: People moved from handling calls to handling claims or to handling correspondence throughout the |

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| | same day, right? |
| | A:  Yes. That's right. |
| 9.   Plaintiff's shift at Prudential began at 8:00 a.m. and ended at 4:00 p.m. | 9.   Plaintiff's Depo., 23:9-11, 14. |
| | Q:  And the shift when you were working at the company began at 8:00 a.m. and ended at 4:00 p.m., correct? |
| | A:  Yes. |
| 10.  Plaintiff never had to work weekends.  Plaintiff always worked a five-day week. | 10.  Plaintiff's Depo., 167:3-6. |
| | Q:  You never had to work weekends, right? |
| | A:  No, I didn't have to work weekends. |
| | Q:  You were always on a five-day week? |
| | A:  Yes. That's correct. |
| 11.  Plaintiff received a 30-minute lunch break as part of her regular shift from 8:00 a.m. to 4:00 p.m. | 11.  Plaintiff's Depo., 24:1-3, 6. |
| | Q:  And as part of your regular shift from 8:00 a.m. to 4:00 p.m., you received a 30-minute lunch break, correct? |
| | A:  Yes. That's correct. |
| 12.  Plaintiff took 30 minutes for lunch every day. | 12.  Plaintiff's Depo., 24:8, 11. |
| | Q:  You took 30 minutes for lunch every day, right? |
| | A:  Yes. That's correct. |
| 13.  Plaintiff was told that she would have two ten-minute breaks during each workday. Plaintiff was allowed to take two ten-minute breaks every workday. | 13.  Plaintiff's Depo., 25:3-5, 26:16-21. |
| | Q:  There were two ten-minute breaks that you were allowed to take every day, correct? |
| | A:  Yes. That's correct. |
| | Q:  You were told that you would have two ten-minute breaks during each workday, correct? |

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| | A: Yes. That's correct. |
| | Q: And you were always allowed to take two ten- minute breaks each workday, right? |
| | A: Yes, I was. |
| 14. There was a third block of ten minutes where Plaintiff was allowed to do whatever she wanted and did not have to perform work activities. | 14. Plaintiff's Depo., 25:6-8, 12-13. |
| | Q: And there was a third block of ten minutes where you were allowed to do whatever you wanted and not have to perform work activities, correct? |
| | A: Yes, if you needed, for example, to use the rest room. |
| 15. Plaintiff understood that during the time that she worked at Prudential she was responsible for performing work for seven hours each day, and Plaintiff had three breaks totaling 30 minutes and one lunch period totaling 30 minutes. | 15. Plaintiff's Depo., 25:15-19, 23-26:2. |
| | Q: And so you understood during the time that you worked at Prudential you were responsible for seven hours of performing work each day, you had three breaks totaling 30 minutes and one lunch period totaling 30 minutes, correct? |
| | A: Well, really -- it wasn't fully an hour unless you did have to use the bathroom. So really, I guess with the -- the ten minutes extra or what have you -- I mean, it was just used if you needed to use it, but not always every single day. |
| 16. As part of her regular work shift from 8:00 a.m. to 4:00 p.m., Plaintiff had 30 minutes of an unpaid lunch and the remaining seven and a half hours were paid. | 16. Plaintiff's Depo., 24:13-16, 20. |
| | Q: And so as part of your regular work shift from 8:00 a.m. to 4:00 p.m., you had 30 minutes of an unpaid lunch and the remaining seven and a half hours were paid, correct? |
| | A: Yes, yes. Yes, that's correct. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 17. Plaintiff automatically got paid for 37.5 hours per week. | 17. Plaintiff's Depo., 168:11-13.<br><br>Q: And so you automatically got paid for 37 1/2 hours per week, right?<br><br>A: Yes. |
| 18. Plaintiff did not work over 40 hours a week at Prudential. | 18. Plaintiff's Depo., 241:23-25; 242:4-5.<br><br>Q: But based on your understanding that overtime was over 40 hours a week, there were not weeks at Prudential when you worked over 40 hours, correct?<br><br>A: No, I didn't work over 40 hours a week at Prudential. |
| 19. Plaintiff did not want to work overtime. If the option of working voluntary overtime had been offered to Plaintiff, Plaintiff would have declined. | 19. Plaintiff's Depo., 45:6-10, 12-13.<br><br>Q: You didn't want to work overtime as well, correct?<br><br>A: Yes. That's correct.<br><br>Q: So if overtime had been offered to you and it was voluntary, you would have declined?<br><br>A: Yes. That's correct. I would have declined. |
| 20. The Agoura Hills office did not have an incentive program where employees were paid per call. | 20. Plaintiff's Depo., 284:24-285:4, 8-10.<br><br>Q: Some call centers have an incentive program where they pay an employee per call. The employee gets a base wage and then maybe a dollar or a couple of dollars for each call that they complete. There wasn't any program like that in effect at Prudential to your knowledge, right?<br><br>A: I don't know about anywhere else. I just know here in the Agoura Hills office that was not something offered to us. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 21.  Plaintiff had a pay rate of $19.48 per hour. | 21.  Plaintiff's Depo., 224:22-225:1<br><br>Q:  And just to get an accurate pay rate on there, on page 2 of this, it indicates that you had a pay rate of $19.48. Is that accurate?<br><br>A:  Yes. It looks like it's 48. It looks like 49 on one of them, but it's a penny. |
| 22.  On the worst day, Plaintiff could work 13 to 15 minutes of extra time.  In the worst case scenario week, Plaintiff would work 15 extra minutes, five days a week. | 22.  Plaintiff's Depo., 166:19-167:2.<br><br>Q:  . . . how much extra time did you work on the worst day?<br><br>A:  On the worst day? I would say it could be up to like 13, 15 minutes.<br><br>Q:  Okay. And if this was the worst case scenario week -- let's say 15 minutes of extra time worked each day without being paid -- that would be 15 minutes times five days a week, right?<br><br>A:  Yes. |
| 23.  If Plaintiff was working the worst amount of uncompensated time every day of the workweek, that would be 15 minutes per day or roughly 1 hour and 15 minutes per week. | 23.  Plaintiff's Depo., 167:17-21.<br><br>Q:  So you were working the worst amount of uncompensated time every day of the workweek, that would be 15 minutes per day or 1 hour and 15 minutes per week, right?<br><br>A:  Yes, roughly about that. |
| 24.  When Plaintiff was working the most time without being paid, Plaintiff should have been paid for 38 hours and 45 minutes per week. | 24.  Plaintiff's Depo., 169:8-16.<br><br>Q:  Okay. So 37 1/2 -- we add the hour. That's 38. And then we add the extra 15 minutes. That makes it 38 hours and 45 minutes.<br><br>A:  Yes.<br><br>Q:  So instead of being paid 37 1/2 hours per week on the worst weeks when you were working the most time without being paid, you should have been paid 38 hours |

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| | and 45 minutes per week? |
| | A: Yes. That's correct. |
| 25. The shift starting and stopping time -- 8:00 a.m. to 4:00 p.m. -- was automatically recorded by the company without Plaintiff having to punch a time clock or fill out a time card | 25. Plaintiff's Depo., 23:21-25. |
| | Q: The shift starting and stopping time -- 8:00 a.m. to 4:00 p.m. -- that was automatically recorded by the company without you having to punch a time clock or fill out a time card, right? |
| | A: Yes. That's correct. |
| 26. Plaintiff was sure that there was a policy regarding payroll and timekeeping. | 26. Plaintiff's Depo., 240:1-3. |
| | Q: You are sure that there was a policy regarding payroll and timekeeping, right? |
| | A: Yes. |
| 27. Prudential had an electronic intranet system, which had a section on payroll and overtime, but Plaintiff did not review it. | 27. Plaintiff's Depo., 238:14-16. |
| | Q: And the Prudential electronic intranet system also had a section on payroll and overtime, correct? |
| | A: I'm sure it did. I didn't review it, though. |
| 28. There were resources to find out who the appropriate contact person is for payroll issues or human resources issues, but Plaintiff left the issue alone. | 28. Plaintiff's Depo., 249:16-19, 249:22-250:2. |
| | Q: But you understood at Prudential that if you had wanted to try to navigate to find out who the appropriate person is for payroll issues or human resources issues, there were resources to find those people, right? |
| | A: It's just something to where I -- I didn't want to be, I guess, going behind someone's back or questioning somebody's authority, considering everything that we were going through on a day-to-day basis. So it was just something that I just -- I just left alone even though I saw that it wasn't right. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 29. Plaintiff never said to a supervisor or manager that she stayed beyond her shift ending time today nor asked either how should I record the time nor how am I allowed to record the extra time worked. | 29. Plaintiff's Depo., 71:20-23.<br><br>Q: . . . [D]id you ever say to a supervisor or manager, you know, "I stayed beyond my shift ending time today, how should I record or am I allowed to record the extra time worked?"<br><br>A: No. No, I didn't go ahead and push the subject. |
| 30. Plaintiff did not keep any separate set of records on her own showing the times that she arrived at work. | 30. Plaintiff's Depo., 95:10-12.<br><br>Q: Did you ever keep any separate set of records on your own showing the times that you arrived at work?<br><br>A: No, I didn't. |
| 31. There are no specific days when Plaintiff can remember the time she stopped working. | 31. Plaintiff's Depo., 111:19-20, 25-112:1.<br><br>Q: So is there any day specifically when you can remember the time you stopped working?<br><br>A: No. I cannot tell you for a specific day, no. |
| 32. If Plaintiff were to look through Prudential's time records, she would not be able to spot specific days that she thinks are inaccurate. | 32. Plaintiff's Depo., 93:18-23.<br><br>Q: Okay. If you were to look through them, would you be able to spot specific days that you think are not accurate?<br><br>A: No. No. Realistically, I don't know who could do that. I know I can't, so no. I wouldn't be able to say which days are not accurate. |
| 33. Plaintiff was required to log all work-related activities in the daily production reports. | 33. Plaintiff's Depo., 149:25-150:2.<br><br>Q: These daily production reports were your requirement to log all work-related activities?<br><br>A: Yes. That's correct. |

9

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 34.  Plaintiff filled in the amount of time spent on each of her different work-related activities each day. | 34.  Plaintiff's Depo., 150:19-21, 25.<br><br>Q:  And so looking at all of these dates, you filled in the amount of time spent on each of these different work-related activities per day, correct?<br><br>A:  Yes. That's correct. |
| 35.  The daily production report wasn't a system where someone was just supposed to routinely record seven hours a day -- they were supposed to record the actual amount of time spent. | 35.  Plaintiff's Depo., 160:25-161:3, 7.<br><br>Q:  And so this wasn't a system where someone was just supposed to routinely record seven hours a day, they were supposed to record the actual amount of time spent, right?<br><br>A:  Yes. That's correct. |
| 36.  The daily production report lists different types of production, different types of work done (such as claims, telephone, correspondences), and different types of nonproductive time (such as vacations, PTO time, time spent in meetings).  The daily production report also lists a sum of production minutes for each of the activities. | 36.  Plaintiff's Depo., 146:21-147:8.<br><br>Q:  Sure. This is a daily production report which is for your work beginning on January 2nd, 2009.<br><br>A:  Mm-hmm.<br><br>Q:  And there are different types of production --<br><br>A:  Yes.<br><br>Q:  -- different types of work done. There's claims, there's telephone --<br><br>A:  Yes.<br><br>Q:  -- and then there's correspondence and there's also nonproductive time, vacations, PTO time, time spent in meetings. And there is a sum of production minutes for each of these activities.<br><br>A:  Okay. |

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 37. The daily production report would probably be the closest thing to something being accurate as regards to some type of record kept for what Plaintiff did for production throughout the day. | 37. Plaintiff's Depo., 151:22-24; 152:4-7.<br><br>Q: This is the most accurate record that you're aware of showing the amount of time you spent during the day on different work activities, right?<br><br>A: I would say it would probably be the closest thing to something being accurate as regards to some type of record kept for what we did for production throughout the day. |
| 38. If Plaintiff were to find her handwritten journal, the handwritten journal would include the same amount of minutes that she entered electronically. | 38. Plaintiff's Depo., 154:7-22.<br><br>Q: So if we were to find this handwritten journal, the handwritten journal to your memory would include the same amount of minutes that you entered electronically, correct?<br><br>A: I would say yes. Sometimes I had questions on them myself because you could go a day or two, just get caught up with doing -- doing your work and stuff because this -- unfortunately with doing these reports, it affected your time to process -- process claims and what have you and other things that we were required to work on. But this is the close -- the thing that comes the closest to doing it and sometimes, you know, you can do it every day or sometimes some people would do them weekly and just copy and enter it into the system. Me personally, I try to do it -- do it every -- every day or at least every other day. |
| 39. Prudential's policy was to enter the time worked in the daily production report every day. | 39. Plaintiff's Depo., 154:23-25.<br><br>Q: The Prudential policy was to do it every day, correct?<br><br>A: Yes. That's correct. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 40. When Plaintiff recorded the total amount of time she worked on a particular day, it was always accurate. | 40. Plaintiff's Depo., 38:21-24; 39:2.<br><br>Q: But when you recorded the total amount of time you worked on a particular day --<br><br>A: Mm-hmm.<br><br>Q: -- that was always accurate, correct?<br><br>A: I would say yes. |
| 41. In fact, Plaintiff admitted that she did not "know of" any other record that could be more accurate than the production log. | 41. Plaintiff's Depo., 155:1-5.<br><br>Q: And there is no other set of records that you're aware of that would have a more accurate representation of the amount of time you spent on these various daily activities, right?<br><br>A: No, not that I know of. |
| 42. The shift when Plaintiff was working at Prudential began at 8:00 a.m. and ended at 4:00 p.m. | 42. Plaintiff's Depo., 23:9-11, 14.<br><br>Q: And the shift when you were working at the company began at 8:00 a.m. and ended at 4:00 p.m., correct?<br><br>A: Yes. |
| 43. On some days, Plaintiff got to the office only a couple of minutes before her shift started. | 43. Plaintiff's Depo. 96:13-14, 17.<br><br>Q: On some days you got to the office at only a couple of minutes before your shift started, correct?<br><br>A: Yes. That's correct. |
| 44. On some days, Plaintiff got to the office exactly at the time her shift started. | 44. Plaintiff's Depo. 97:1-3.<br><br>Q: And on some days, you got to the office exactly at the time that your shift started, correct?<br><br>A: Yes. That's correct. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 45. On some days, Plaintiff got to the office after her shift started. | 45. Plaintiff's Depo., 96:19-20, 23-24.<br><br>Q: And on some days you got to the office after your shift started, correct?<br><br>A: Yes. Yes. That could happen as well. |
| 46. Plaintiff was never disciplined or demoted or had her pay cut or in any way disciplined or counseled about the time she arrived at the office. | 46. Plaintiff's Depo., 98:17-20, 23-99:2.<br><br>Q: Well, even though they may have requested you to show up earlier, you were never disciplined or demoted or had your pay cut or in any way counseled about the time that you arrived at the office, right?<br><br>A: No.<br><br>Q: You never received any of that discipline or counseling?<br><br>A: No. No, I didn't. |
| 47. If somebody was following the policy articulated at the call center where Plaintiff worked, they could have logged onto to just one of those systems by 8:00 a.m. and then logon to the other systems after 8:00 a.m. | 47. Plaintiff's Depo., 203:21-25, 204:4.<br><br>Q: But if somebody was following the policy articulated at the call center where you worked, they could have logged on to just one of those systems by 8:00 a.m. and then logon to the other systems after 8:00 a.m., right?<br><br>A: Yes. That's true. |
| 48. Plaintiff, in order to be considered logged on by 8:00 a.m., might still be logging on to programs after 8:00 a.m. Plaintiff could login to those other computer systems after 8:00 a.m. | 48. Plaintiff's Depo., 202:6-8, 11; 205:13-15.<br><br>Q: And so in order to be considered logged on by 8:00 a.m., you might still be logging on to programs after 8:00 a.m., right?<br><br>A: Yes. That's correct.<br><br>Q: And you could login to those other computer systems after 8:00 a.m., right? |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| | A:  Yes. You could go ahead and do that. |
| 49.  On the dates when Plaintiff had to begin her shift on telephones, the majority of the time the systems she had to bring up were Lotus Notes which could take up to two minutes, the telephone queue IP Agent which would take 15 or 20 seconds, the ABC system which could take a minute to a minute and a half, and the CFE system which could take two to three minutes | 49.  Plaintiff's Depo., 194:16-24.

Q:  So on the dates when you had to begin your shift on telephones, the majority of the time it was Lotus Notes which could take up to two minutes, the telephone queue IP Agent which would take 15 or 20 seconds, the ABC system which could take a minute to a minute and a half, and the CFE system which could take two to three minutes; is that right?

A:  Yes. That's right, yes, to get all of these systems up, yes. |
| 50.  The Pride system could take some time to logon to.  It could take five minutes, sometimes seven minutes. | 50.  Plaintiff's Depo., 193:11-15.

Q:  And the Pride system -- how long did that take to logon to?

A:  That could take some time. It could take five minutes, sometimes seven minutes. It took a long time. |
| 51.  Plaintiff had to log-on to the Pride system in the morning only 30, 40 percent of the time. | 51.  Plaintiff's Depo., 193:16-19.

Q:  And what percentage of the time in the morning did you have to logon to the Pride system?

A:  I would say probably maybe a good 30, 40 percent. |
| 52.  The telephone queue took about 15, 20 seconds to log into. | 52.  Plaintiff's Depo., 192:23-193:3.

Q:  And the telephone queue -- how long did it take to load into that assuming no human error, that you remembered the password, that you were able to type at a regular speed, all of that?

A:  It probably took about 15, 20 seconds. It didn't take that long. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 53. If someone arrived 30 seconds before 8:00 a.m., they could be logged on to the telephone queue at 8:00 a.m. | 53. Plaintiff's Depo., 205:2-6.<br><br>Q: Sure. If the telephone queue took 15 to 20 seconds to logon to, then if somebody arrived 30 seconds before 8:00 a.m., they could be logged on to the telephone queue at 8:00 a.m.?<br><br>A: Yes. |
| 54. Plaintiff could log out within three minutes. | 54. Plaintiff's Depo., 210:22-24, 211:2.<br><br>Q: And on days when it didn't freeze and things logged out correctly, it could be done in less than two minutes?<br><br>A: I would say within three minutes. |
| 55. Though Plaintiff could avoid calls after 4:00 p.m. by logging out of IP Agent, Plaintiff could also stay into "not ready" or "wrap up," where she would not get anymore phone calls while wrapping up her work. | 55. Plaintiff's Depo., 206:11-15, 19-25.<br><br>Q: But if you could logout of the systems in whatever sequence or order you wanted to -- if you wanted to avoid calls that went after 4:00, the first thing you would logout of would be IP Agent because once you're out of that you're out of the call queue, right?<br><br>A: You could basically -- you wouldn't even necessarily have to logout. You can stay into -- I forget what it was called there. It might have been like "not ready" or "wrap up" or something like that to where you could still be in the system but where you block from not getting anymore phone calls while you're wrapping up your work. |
| 56. On days when Plaintiff was not on a call, she could start logging out at 3:50 p.m. | 56. Plaintiff's Depo., 214:3-11.<br><br>Q: On days where you were not on a call, you could start logging out at 3:50 p.m., right?<br><br>A: Yeah. I mean, we still -- we had to go ahead and, you know, finish our |

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| | work or, you know, pretty much just get any paperwork we had organized, put back in our desk or what have you, start logging out of your systems if we didn't have a phone call or whatever. But Prudential always made sure they could squeeze every minute out of you. |
| 57. On average, Plaintiff left anywhere from 4:07 to 4:15 p.m. each day. | 57. Plaintiff's Depo., 165:15-18.<br><br>A: Okay. Well, it wouldn't be every day, but I mean that I stayed, I mean, 15, 20 minutes later. But, I mean, on average, I left anywhere from 4:07 to 4:15 each day. |
| 58. On the dates when Plaintiff was three minutes or five minutes or ten minutes late, Plaintiff never told any supervisor or manager to adjust her time. | 58. Plaintiff's Depo., 228:9-11, 16.<br><br>Q: On the dates when you were three minutes or five minutes or ten minutes late, you never told any supervisor or manager to adjust your time, right?<br><br>A: No, I didn't ask anyone. |
| 59. Prudential HR Policies include policies on recording the time you work and overtime. | 59. Declaration of Charlene Franke ("Franke Decl."), ¶ 3, Exh. A, pp. 1-2. |
| 60. The policy states that all employees in positions that are classified as nonexempt must be paid overtime in accordance with applicable federal, state and local laws.  The policy also states that employees must complete and submit overtime documents within the required time frame. | 60. Franke Decl., ¶ 3, Exh. A, pp. 1-2 |
| 61. For time that does not qualify as FLSA overtime beyond 40 hours in a workweek Prudential's policy states that employees whose standard workweek is 37.5 hours receive their 'straight' time for additional hours worked beyond 37.5 hours. | 61. Franke Decl., ¶ 3; Exh. A, p. 2. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 62.  Plaintiff was paid $730.50 per week. | 62.  Plaintiff's Depo., Exh. 8. |

## II.    CONCLUSIONS OF LAW

### A.    Conclusions Of Law Regarding Summary Judgment Standard

| Conclusion of Law | Authority |
|---|---|
| 63.  If there is no genuine issue of material fact as to any material fact, then the movant is entitled to judgment as a matter of law. | 63.  Fed. R. Civ. P. 56(c)(2). |
| 64.  Summary judgment is routinely granted for employers in claims for unpaid wages brought under the FLSA. | 64.  *See, e.g., Parth v. Pomona Valley Hosp. Med. Ctr.*, 584 F.3d 794, 803 (9th Cir. 2009) (affirming summary judgment for the employer on claim for unpaid overtime under FLSA § 207(a)(1); e conclude, as did the district court, that [plaintiff] failed to reduce any evidence or authority to support her claim . . . [based on] the FLSA."); *Boykin v. Boeing Co.*, 128 F.3d 1279, 1280 (9th Cir. 1997) (affirming summary judgment for employer on claim for overtime pay). |

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### B. Conclusions Of Law Regarding Plaintiff's Claim For Unpaid Overtime

| Conclusion of Law | Authority |
|---|---|
| 65. Plaintiff's cause of action for overtime pay under the Fair Labor Standards Act ("FLSA") must fail because the FLSA mandates that employers pay overtime premium pay only when an employee works in excess of 40 hours in one workweek. | 65. *See* 29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of its employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed"); *see, e.g., Smith v. T-Mobile USA, Inc.*, 570 F.3d 1119, 1120 n.1 (9th Cir. 2009) ("The FLSA states, in relevant part, that 'no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.'") (citing 29 U.S.C. § 207(a)(1)). |

### C. Conclusions Of Law Regarding Plaintiff's Claim For Unpaid Overtime

| Conclusion of Law | Authority |
|---|---|
| 66. The FLSA allows recovery only for violation of its overtime pay requirements or its minimum wage requirements. | 66. *See* 29 U.S.C. § 206(a)(1); 29 U.S.C. § 207(a)(1). |
| 67. To the extent Plaintiff has pled a minimum wage cause of action for non-overtime off the clock work, Plaintiff's claim for minimum wage must fail because the minimum wage requirements of the FLSA merely require payment of the federal minimum wage based on the number of hours worked. | 67. *See, e.g., Maciel v. City of Los Angeles*, 542 F. Supp. 2d 1082, 1097 (C.D. Cal. 2008) ("No violation [of the FLSA's] minimum wage requirements occurs so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory |

| Conclusion of Law | Authority |
|---|---|
| | requirement."). *Accord Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986) ("[N]o violation [of the FLSA] occurs so long as the total weekly wage paid by an employer … [is] equal to the number of hours actually worked that week multiplied by the minimum hourly [rate].") (internal quotation omitted). |
| 68. To the extent Plaintiff has pled a minimum wage cause of action for non-overtime off the clock work, Plaintiff's claim for minimum wage must fail because any alleged off the clock work does not exceed the overtime limit, and even if it were uncompensated, the "gap time" is still being paid the minimum wage when averaged across the actual time worked. | 68. *See Adair v. City of Kirkland*, 185 F.3d 1055, 1062 n.6 (9th Cir. 1999) ("The district court properly rejected any minimum wage claim . . . finding that [the plaintiffs'] salary, when averaged across their total time worked, still paid them above minimum wage."; "'[G]ap time' refers to time that is not covered by the overtime provisions [of the FLSA] because it does not exceed the overtime limit, and to time that is not covered by the minimum wage provisions [of the FLSA] because, even though it is uncompensated, the employees are still being paid a minimum wage when their salaries are averaged across their actual time worked."); *see also Maciel v. City of Los Angeles*, 542 F. Supp. 2d 1082, 1097 (C.D. Cal. 2008) ("No violation [of the FLSA's] minimum wage requirements occurs so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement."). *Accord Monahan v. County of Chesterfield*, 95 F.3d 1263, 1282 (4th Cir. 1996) (claims for gap time are not cognizable under the FLSA "when the employer has not violated the FLSA's minimum wage/maximum hour provisions"); *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. |

| Conclusion of Law | Authority |
|---|---|
| | 1986) ("a violation of section 206(a) [of the FLSA] occurs when an employee is paid at a rate that is below the minimum rate.  The statute requires the payment of a minimum wage to [employees] who in any work week [are] engaged in commerce,' . . . and sets the minimum wage in terms of an hourly rate.  However, no violation occurs 'so long as the total weekly wage rate paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.'"); *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193, 1197-1198 (4th Cir. 1969) ("the employer was in compliance with the minimum wage revisions and . . . there was no statutory violation [of the FLSA] so long as 'each employee received during each workweek compensation equal to or exceeding the product of the total number of hours worked and the statutory minimum hourly rate'"); *Robertson v. Board of County Comm's*, 78 F. Supp. 2d 1142, 1159 (D. Colo. 1999) ("Defendant's practice of not paying for 'gap time' cannot be considered a violation of the FLSA."); *Dove v. Coupe*, 759 F.2d 167, 172 (D.C. Cir. 1985) (holding that it was error to consider "a period shorter than the workweek to measure compliance with minimum wage law"); *Marshall v. Sam Dell's Dodge Corp.*, 451 F. Supp. 294, 301-303 (N.D.N.Y. 1978) ("If the total wage paid to each [employee] in this case during any given week is divided by the total time he worked that week, the resulting hourly wage exceeds [the minimum wage] for every week and every [employee] involved.  We believe this is all |

12850846v.4

20

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| **Conclusion of Law** | **Authority** |
|---|---|
| | that is necessary to meet the requirements of § 206(a) [of the FLSA]"). |
| 69. To the extent Plaintiff has pled a minimum wage cause of action for non-overtime off the clock work, Plaintiff's claim for minimum wage must fail because Plaintiff deliberately failed to comply with Prudential's written and published time recording policies and deliberately failed to inform her supervisor or manager about her alleged off the clock work. | 69. *See Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414-415 (9th Cir. 1981) (affirming summary judgment where the plaintiff, "besides not attempting to notify [the employer] of his alleged uncompensated overtime hours, [plaintiff] deliberately omitted the inclusion of those hours from his time sheet even though he admittedly knew that he would have been paid for those hours"; "An employer must have an opportunity to comply with the provisions of the FLSA . . . . [W]here the acts of an employee prevent an employer from acquiring knowledge here of alleged uncompensated [work] hours, the employer cannot be said to have suffered or permitted the employee to work in violation of [the FLSA]."); *see also* 29 U.S.C. § 516.2(c) (permitting employers to use timekeeping systems that show the pre-set schedule of daily and weekly hours normally worked and allow deviations to be recorded for those weeks in which the employee's actual hours differ from the pre-set schedule). |
| 70. To the extent Plaintiff has pled a minimum wage cause of action for non-overtime off the clock work, Plaintiff's claim for minimum wage must fail because Plaintiff's unsubstantiated assertions do not meet her burden to prove that she has performed work for which she was not compensated. | 70. *See Harvill v. Westward Comm'ns, LLC*, 433 F.3d 428, 440-441 (5th Cir. 2005) (holding that "unsubstantiated assertions" were inadequate to meet the plaintiff's burden to "demonstrate that she has performed work for which . . . she was not compensated"; "[Plaintiff] has failed to raise a genuine issue of material fact as to whether she went uncompensated for overtime work. Accordingly, the district court did not err in granting summary judgment for [her employer] on [plaintiff's] FLSA claim."). |

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| | **Conclusion of Law** | **Authority** |
|---|---|---|
| | 71. To the extent Plaintiff has pled a minimum wage cause of action for non-overtime off the clock work, Plaintiff's claim for minimum wage must fail because bare assertions that an employer's records are "inaccurate" are not enough to survive summary judgment. | 71. *See, e.g., Millington v. Morrow County Bd. of Com'rs*, 2007 WL 2908817 at *3, 4 (S.D. Ohio 2007) (granting summary judgment on an FLSA claim based on the plaintiff's lack of sufficient proof of extra time worked; "plaintiff states in his affidavit that he was required to work in excess of forty hours per week without compensation [and] that he was not required to document his time in excess of forty hours per week;" "an employer cannot suffer or permit an employee to perform services about which the employer knows nothing;" "there is no violation of the FLSA where the employee performs uncompensated work but deliberately prevents his employer from learning of it;" "[p]laintiff's bare allegation that he worked an average of five hours [extra] every week . . . is insufficient to meet his burden of proof"); *Simmons v. Wal-Mart Assocs. Inc.*, 2005 WL 1684002 at *10 (S.D. Ohio 2005) (granting summary judgment on an FLSA claim; "The Court finds plaintiff has failed to adduce sufficient evidence to withstand summary judgment on his wage and hour claims.  The only evidence plaintiff offers is his assertion that [his employer] required him to work off the clock in excess of 200 times for which he was never compensated. Plaintiff alleges he worked off the clock . . . approximately 92 times before clocking in for his shift, . . . and . . . approximately 55 to 60 times after clocking out at the end of his shift.  However, plaintiff fails to support his assertions with any additional evidence."  "Put simply, plaintiff's bald assertion that . . . he worked off the clock over 200 times on unspecified days is not enough to create genuine issues of material fact as to whether he is owed any additional |

| Conclusion of Law | Authority |
|---|---|
| | compensation.  Plaintiff has failed to produce sufficient evidence to show the amount and extent of his uncompensated work as a matter of 'just and reasonable inference'"). |
| 72.  To the extent Plaintiff has pled a minimum wage cause of action for non-overtime off the clock work, Plaintiff's claim for minimum wage must fail because time worked before and after a scheduled shift is not compensable if the extra time is *de minimis*. | 72.  *See Anderson v. Mt. Clemens Pottery Co.*, 368 U.S. 680, 692-693 (1946) ("It is only when an employee is required to give up a **substantial** measure of his time and effort that compensable working time is involved . . . . [I]t is appropriate to apply a *de minimis* doctrine so that insubstantial and insignificant periods of time spent in preliminary activities need not be included in the statutory workweek.) (emphasis added); *see also Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984) (adopting *de minimis* doctrine that insubstantial and insignificant periods of time spent need not be compensated). |
| 73.  To the extent Plaintiff has pled a minimum wage cause of action for non-overtime off the clock work, Plaintiff's claim for minimum wage must fail because time qualifies as *de minimis* based on the irregularity of additional work allegedly performed, the practical administrative difficulty of recording any additional work allegedly performed, and the aggregate amount of additional work allegedly performed. | 73.  *See Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984) (finding that time qualifies as *de minimis* based on the regularity of the additional work performed, the practical administrative difficulty of recording the additional time for the employer, and the aggregate amount of compensable time). |

DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| Conclusion of Law | Authority |
|---|---|
| 74. To the extent Plaintiff has pled a minimum wage cause of action for non-overtime off the clock work, Plaintiff's claim for minimum wage must fail because uncompensated work of approximately 10 minutes per day is most often considered *de minimis* and, therefore, not compensable. | 74. *See, e.g., Rutti v. Lojack Corp.*, 896 F.3d 1046, 1057-58 (9th Cir. 2010) ("No rigid rule can be applied with mathematical certainty.  Nonetheless, most courts 'have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable.'"); *Lindow*, 738 F.2d at 1062 ("Most courts have found daily periods of approximately 10 minutes de minimis even though otherwise compensable.").  *Accord E.I. du Pont De Nemours & Co. v. Harrup*, 227 F.2d 133, 135-36 (4th Cir. 1955) (10 minutes not compensable); *Green v. Planters Nut & Chocolate Co.*, 177 F.2d 187, 188 (4th Cir. 1949) ("obvious" that 10 minutes is *de minimis*); *Carter v. Panama Canal Co.*, 314 F. Supp. 386, 392 (D.D.C. 1970) (2 to 15 minutes is *de minimis*), *aff'd*, 463 F.2d 1289 (D.C. Cir.), *cert. denied*, 409 U.S. 1012 (1972); *Hesseltine v. Goodyear Tire & Rubber Co.*, 391 F. Supp. 509, 519-20 (E.D. Tex. 2005) (up to 15 minutes spent preparing for work was held to be *de minimis*); *Anderson v. Pilgrim's Pride Corp.*, 147 F. Supp. 2d 556, 563-64 (E.D. Tex. 2001) (holding that 10 minutes spent cleaning and putting on safety gear was not compensable because the time was *de minimis;* "[t]he majority of courts have found daily periods of approximately 10 minutes *de minimis* as a matter of law."). |

DATED: November 8, 2010

**SEYFARTH SHAW LLP**


By: _____/s/ Jon D. Meer_____
JON D. MEER
Attorneys for Defendant
THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, INC.