1  JON D. MEER (State Bar No. 144389)
   jmeer@seyfarth.com
2  SIMON L. YANG (State Bar No. 260286)
   syang@seyfarth.com
3  **SEYFARTH SHAW LLP**
   2029 Century Park East, 35th Floor
4  Los Angeles, California  90067-3021
   Telephone:   (310) 277-7200
5  Facsimile:    (310) 201-5219

6  LORIE E. ALMON (*admitted pro hac vice*)
   lalmon@seyfarth.com
7  **SEYFARTH SHAW LLP**
   620 Eighth Avenue, 32nd Floor
8  New York, New York  10018
   Telephone:   (212) 218-5500
9  Facsimile:    (212) 218-5526

10 Attorneys for Defendant
   THE PRUDENTIAL INSURANCE
11 COMPANY OF AMERICA, INC.

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14                    **WESTERN DIVISION**

15 | DOMINIQUE OSBORNE, on her own behalf on behalf of a class of similarly situated persons pursuant to F.R.C.P. 23 and 23 U.S.C. § 216, and on behalf of the General Public, | Case No. 2:10-CV-02465 JFW (CWx) |

*The Hon. John F. Walter*

**DECLARATION OF JON D. MEER IN SUPPORT OF DEFENDANT PRUDENTIAL INSURANCE COMPANY OF AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT**

              Plaintiffs,

        v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, a New
Jersey Corporation,

              Defendant.

Date:              December 6, 2010
Time:              1:30 p.m.
Courtroom:      16

Complaint Filed:      April 5, 2010
Discovery Cutoff:    March 1, 2011
Motion Cutoff:        March 28, 2011
Pre-Trial Conf.:       May 6, 2011
Trial Date:            May 24, 2011

12860274v.1 / 33250-270008

I, JON D. MEER, declare and state as follows:

1. I have personal knowledge of the facts contained in this declaration, and if called as a witness, I could and would testify as to their accuracy.

2. I am an attorney licensed to practice law in the State of California, and I am admitted to appear before this Court. I am a partner in the law firm of Seyfarth Shaw LLP in Los Angeles, California, and I am the attorney with primary responsibility for representing Prudential Insurance Company of America, Inc. ("Prudential" or "Defendant") in the above-captioned matter, filed by Plaintiff Dominique Osborne ("Plaintiff"). True and correct copies of all of the pleadings, records and transcripts in this matter are maintained in my office, in the ordinary course of business, under my direction and control.

3. I took the deposition of Plaintiff on July 6, 2009. Thereafter, I ordered an original, certified copy and mini-transcript of the deposition from the certified shorthand reporter.

4. I prepared Defendant's Motion for Summary Judgment based on Plaintiff's deposition testimony. I have underlined the deposition testimony cited in the motion. Excerpts of Plaintiff's deposition testimony and exhibits cited in Defendant's motion are attached hereto as Exhibit "A" and incorporated herein by this reference.

5. A true and correct copy of the full single-sided mini-transcript of Plaintiff's deposition will be submitted to Chambers, along with the courtesy copies of Defendant's moving papers.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct based on my own personal knowledge.

Executed this 8th day of November, 2010 in Los Angeles, California.

_____
JON D. MEER

12860274v.1 / 33250-270008

1

DECLARATION OF JON D. MEER IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


DOMINIQUE OSBORNE, on her own )
behalf and on behalf of a      )
class of similarly situated    )
persons pursuant to F.R.C.P.   )
23 and 23 U.S.C. 216, and on   )
behalf of the General Public,  )
                               )
            Plaintiffs,        )
                               )
        vs.                    ) No. CV10-2465 JFW (CWx)
                               )
THE PRUDENTIAL INSURANCE       )
COMPANY OF AMERICA, a New      )
Jersey Corporation,            )
                               )
            Defendant.         )
_____)


VIDEOTAPED DEPOSITION OF

DOMINIQUE OSBORNE

Los Angeles, California

Tuesday, July 6, 2010


Reported by:
ANDREA M. RINKER
CSR No. 13437
JOB No. 9316R

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4    DOMINIQUE OSBORNE, on her own )
     behalf and on behalf of a     )
5    class of similarly situated   )
     persons pursuant to F.R.C.P.   )
6    23 and 23 U.S.C. 216, and on   )
     behalf of the General Public,  )
7                                   )
               Plaintiffs,          )
8                                   )
          vs.                       ) No. CV10-2465 JFW (CWx)
9                                   )
     THE PRUDENTIAL INSURANCE       )
10   COMPANY OF AMERICA, a New      )
     Jersey Corporation,            )
11                                  )
               Defendant.           )
12   _____)

13

14

15          Deposition of DOMINIQUE OSBORNE, taken

16       on behalf of Defendants, at 2029 Century

17       Park East, 35th Floor, Los Angeles,

18       California, beginning at 10:47 a.m. and

19       ending at 6:42 p.m. on Tuesday, July 6,

20       2010, before ANDREA M. RINKER, Certified

21       Shorthand Reporter No. 13437.

22

23

24

25

Exhibit A, Page 3

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4        TEEPLE HALL LLP
          BY:  JASON N. BLACK
 5        Attorney at Law
          9225 Towne Centre Drive, Suite 500
 6        San Diego, California 92121
          (858) 622-7878
 7
      For Defendant:
 8
          SEYFARTH SHAW
 9        BY:  JON D. MEER
          BY:  SIMON L. YANG
10        Attorneys at Law
          2029 Century Park East, 35th Floor
11        Los Angeles, California 90067
          (310) 277-7200
12
      Videographer:
13
          CHUCK PERRY
14        M&M COURT REPORTERS
          501 North Golden Circle Drive, Suite 106
15        Santa Ana, California 92705
          (714) 972-2300
16
      Also Present:
17
          RICO LAGATTULA
18

19

20

21

22

23

24

25
```

Exhibit A, Page 4

3

         1    understand that?

         2         A   Yes.

         3         Q   Have you taken any medication or alcohol or

         4    anything that might affect your ability to concentrate

10:53    5    and provide your most truthful, most accurate testimony?

         6         A   No, I haven't.

         7         Q   Do you know of any reason why you might be

         8    physically or mentally unable to concentrate and provide

         9    your best and most accurate and most truthful testimony?

10:54   10         A   No.

        11         Q   You were employed by Prudential Insurance

        12    Company in 2008 and 2009, right?

        13              MR. BLACK:  Objection.  Assumes facts not in

        14    evidence.

10:54   15    BY MR. MEER:

        16         Q   Please answer.

        17              MR. BLACK:  You can answer.

        18              THE WITNESS:  Yes.  That's correct.

        19    BY MR. MEER:

10:54   20         Q   You started work on August 21st, 2008 and your

        21    employment ended on -- to July 17th, 2009, correct?

        22         A   I want to say it was before August 21st, but it

        23    was in August.

        24         Q   August 2008, right?

10:54   25         A   Yes.  That's correct.

Exhibit A, Page 5

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
         1          Q    And your employment ended on July 17th, 2009,

         2     right?

         3          A    I'm not sure of the exact date, but I know it

         4     was in July.

10:55    5          Q    And during the time that you were working for

         6     Prudential, you worked at their Agoura Hills location,

         7     correct?

         8          A    Yes.  That's correct.

         9          Q    You never worked at any other location of the

10:55   10     company, right?

        11          A    No, I didn't.

        12          Q    And when you performed the work that you

        13     performed at Prudential, you worked inside the Agoura

        14     Hills office, right?

10:55   15          A    Yes.  That's right.

        16          Q    You didn't have an arrangement where you were

        17     allowed to work at home or from some offsite location,

        18     right?

        19          A    No, I didn't.

10:56   20              (Interruption in the proceedings.)

        21     BY MR. MEER:

        22          Q    And the Agoura Hills location where you worked

        23     was part of a suburban office park setting, right?

        24          A    Yes.  That's correct.

10:56   25          Q    And to start your workday, you parked at the
```

Exhibit A, Page 6

12

```
        1    BY MR. MEER:

        2         Q    When you received training working at

        3    Prudential, you were told what the length of your regular

        4    shift would be, right?

11:07   5         A    Yes.

        6              MR. BLACK:   Same objection.

        7              THE WITNESS:   Yes.

        8    BY MR. MEER:

        9         Q    And the shift when you were working at the

11:07  10    company began at 8:00 a.m. and ended at 4:00 p.m.,

       11    correct?

       12              MR. BLACK:   Objection.   Assumes facts not in

       13    evidence.

       14              THE WITNESS:  Yes.

11:07  15    BY MR. MEER:

       16         Q    And that time from 8:00 a.m. to 4:00 p.m. was

       17    automatically recorded in the company's electronic

       18    records without you having to record it on your own time

       19    card, right?

11:08  20         A    I'm sorry.  Can you repeat that again?

       21         Q    Sure.  The shift starting and stopping time --

       22    8:00 a.m. to 4:00 p.m. -- that was automatically recorded

       23    by the company without you having to punch a time clock

       24    or fill out a time card, right?

11:08  25         A    Yes.  That's correct.
```

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
 1          Q    And as part of your regular shift from 8:00 a.m.

 2    to 4:00 p.m., you received a 30-minute lunch break,

 3    correct?

 4               MR. BLACK:  Objection.  Vague and ambiguous as

 5    to "received."

 6               THE WITNESS:  Yes.  That's correct.

 7    BY MR. MEER:

 8          Q    You took 30 minutes for lunch every day, right?

 9               MR. BLACK:  Objection.  Vague and ambiguous.

10    Overbroad.  Vague as to time.

11               THE WITNESS:  Yes.  That's correct.

12    BY MR. MEER:

13          Q    And so as part of your regular work shift from

14    8:00 a.m. to 4:00 p.m., you had 30 minutes of an unpaid

15    lunch and the remaining seven and a half hours were paid,

16    correct?

17               MR. BLACK:  Objection.  Vague and ambiguous as

18    to "paid."  Overbroad.  Compound.

19               Do you understand the question?

20               THE WITNESS:  Yes, yes.  Yes, that's correct.

21    BY MR. MEER:

22          Q    And also during your regular shift, you received

23    breaks, correct?

24               MR. BLACK:  Objection.  Vague and ambiguous as

25    to "breaks."  Overbroad.
```

Exhibit A, Page 8

24

M and M Court Reporters, Inc.  (714)972-2300  Fax (714)972-1616

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness: Dominique Osborne

1          THE WITNESS:  Yes.  That's correct.

2     BY MR. MEER:

3          Q    There were two ten-minute breaks that you were

4     allowed to take every day, correct?

11:09  5          A    Yes.  That's correct.

6          Q    And there was a third block of ten minutes where

7     you were allowed to do whatever you wanted and not have

8     to perform work activities, correct?

9          MR. BLACK:  Objection.  Assumes facts not in

11:09 10    evidence.  Vague and ambiguous.  Leading.  Overbroad.

11     Compound.

12          THE WITNESS:  Yes, if you needed, for example,

13     to use the rest room.

14     BY MR. MEER:

11:09 15          Q    And so you understood during the time that you

16     worked at Prudential you were responsible for seven hours

17     of performing work each day, you had three breaks

18     totalling 30 minutes and one lunch period totalling

19     30 minutes, correct?

11:10 20          MR. BLACK:  Objection.  Calls for a legal

21     conclusion.  Misstates prior testimony.  Vague and

22     ambiguous.

23          THE WITNESS:  Well, really -- it wasn't fully an

24     hour unless you did have to use the bathroom.  So really,

11:10 25     I guess with the -- the ten minutes extra or what have

Exhibit A, Page 9

25

Dominique Osborne vs. The Prudential Insurance Company of America                                    Date Taken: 7/6/2010
Witness:  Dominique Osborne

1    you -- I mean, it was just used if you needed to use it,

2    but not always every single day.

3    BY MR. MEER:

4        Q    No one ever prohibited you from taking three

11:10  5    ten-minute breaks, right?

6            MR. BLACK:   Objection.   Misstates prior

7    testimony.   Assumes facts not in evidence.   Vague and

8    ambiguous as to "three ten-minute breaks."

9            THE WITNESS:   We were never offered like it was

11:11 10   offered and put out there three minute -- ten-minute

11   breaks.   That wasn't something I did.   If you had to use

12   the bathroom you just use the bathroom.   But

13   realistically, I wasn't always in the bathroom for ten

14   minutes each day.

11:11 15   BY MR. MEER:

16       Q    You were told that you would have two ten-minute

17   breaks during each workday, correct?

18       A    Yes.   That's correct.

19       Q    And you were always allowed to take two ten-

11:11 20   minute breaks each workday, right?

21       A    Yes, I was.

22       Q    And the third ten-minute break was something

23   that you took on an ad hoc basis if you needed to use the

24   rest room or get a cup of coffee or leave your

11:11 25   workstation, correct?

Exhibit A, Page 10

26

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness: Dominique Osborne

1    or not they did, you can answer the question.  But in a

2    deposition, only what you know of your own personal

3    knowledge -- what you saw, heard, touched, smelled.

4          So do you know what type of training other

11:20 5    employees received at your call center location about

6    when to arrive at work and when to leave?

7          A    Only from what I heard them say.  I didn't

8    witness them being instructed by management of when to

9    come in, only from what they may have told me personally.

11:21 10          Q    Did any employees at the call center where you

11    worked tell you that they had received a written policy

12    about when to arrive at work and when to leave work?

13          A    No.

14          Q    And at the call center where you worked, there

11:21 15    were approximately 14 hourly employees?

16          MR. BLACK:  Objection.  Vague and ambiguous.

17    Vague as to "hourly employees."  Calls for a legal

18    opinion.

19          THE WITNESS:  Well, there was more than 14

11:21 20    employees that worked in the call center.  There was

21    other people that did different things that were not

22    all -- not everyone was on the phone.

23    BY MR. MEER:

24          Q    With respect to the call center where you

11:21 25    worked, how many employees can you estimate worked there

Exhibit A, Page 11

34

M and M Court Reporters, Inc.  (714)972-2300  Fax (714)972-1616

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
 1    BY MR. MEER:
 2        Q    You did your best to keep an accurate log,
 3    right?
 4             MR. BLACK:  Objection.  Misstates prior
11:25  5    testimony.
 6             THE WITNESS:  Yes.
 7    BY MR. MEER:
 8        Q    And nobody told you to record your time
 9    inaccurately, right?
11:25 10       A    Well, sometimes people would say you may have to
11    go ahead and put down something.  We would, say, like
12    fudge the numbers on there because you may -- because it
13    was almost impossible to keep track of what you did for a
14    whole seven hours or what have you being there all day.
11:26 15    So sometimes you would have to go ahead and be -- think
16    about like okay, well, I got 15 minutes I got to account
17    for and really didn't -- you couldn't remember what to
18    put there.  So you may have to go ahead -- it was kind of
19    like rob Peter to pay Paul to go ahead and -- to put
11:26 20    everything in the system -- in the access system.
21        Q    But when you recorded the total amount of time
22    you worked on a particular day --
23        A    Mm-hmm.
24        Q    -- that was always accurate, correct?
11:26 25             MR. BLACK:  Objection.  Calls for a legal
```

<span style="color:blue">Exhibit A, Page 12</span>

38

Witness:  Dominique Osborne

```
     1    conclusion.  Vague and ambiguous.

     2              THE WITNESS:  I would say yes.

     3    BY MR. MEER:

     4         Q   And from what you observed from other employees

11:27 5    at the call center location in Agoura Hills, they also

     6    made their best efforts to accurately record the amount

     7    of time that they spent on various work activities,

     8    right?

     9              MR. BLACK:  Objection.  Calls for speculation.

11:27 10   Vague and ambiguous as to record time.

    11              THE WITNESS:  I would say yes.

    12    BY MR. MEER:

    13         Q   And you knew that it was a policy of the call

    14    center where you worked to accurately record the amount

11:27 15   of time that you worked each day, right?

    16              MR. BLACK:  Objection.  Calls for a legal

    17    conclusion.  Misstates prior testimony.  Vague and

    18    ambiguous.  Confusing.  Intentionally confusing.

    19    Compound.

11:27 20             THE WITNESS:  Well, when I first started at

    21    Prudential, I didn't even use the system that you're

    22    describing, the access system until probably like four or

    23    five months after being there.  So I -- so no -- so when

    24    we started doing it and getting used to it, it was --

11:28 25   because it was a very tedious -- not a user-friendly
```

Exhibit A, Page 13

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
 1          Q   And the overtime that was requested was for
 2     people at your level who had already been trained, right?
 3          A   I -- I was never offered overtime even after
 4     training because they told me I wasn't -- wasn't at the
11:42 5     production level that they needed to get the claims out.
 6          Q   You didn't want to work overtime as well,
 7     correct?
 8          A   Yes.  That's correct.
 9          Q   So if overtime had been offered to you and it
11:42 10   was voluntary, you would have declined?
 11             MR. BLACK:  Objection.  Calls for speculation.
 12             THE WITNESS:  Yes.  That's correct.  I would
 13    have declined.
 14    BY MR. MEER:
11:42 15        Q   You saw that other people at the call center did
 16    work overtime, correct?
 17         A   Yes.  That's correct.
 18         Q   And that for most of the weeks when you worked
 19    at the Agoura Hills call center, the majority of
11:42 20   employees from what you observed worked some overtime,
 21    correct?
 22             MR. BLACK:  Objection.  Calls for a legal
 23    conclusion.
 24             THE WITNESS:  Yes.  That's correct.
11:43 25   BY MR. MEER:
```

Exhibit A, Page 14

45

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness: Dominique Osborne

```
  1    handling calls, right?

  2         A   Yes.

  3         Q   And some people were assigned to the activity of

  4    handling claims, correct?

11:45 5     A   Well, yes.  There was people that -- that

  6    strictly were just doing claims, but you can also be on

  7    the phone working because we were always having to

  8    multi-task and work on claims as well.

  9         Q   I understand.

11:46 10    A   Okay.

 11         Q   But there were some people who didn't wear a

 12    headset during some part of the day and they only worked

 13    on claims and didn't take any calls, right?

 14              MR. BLACK:  Objection.  Misstates prior

11:46 15   testimony.  Vague and ambiguous and misleading.

 16              THE WITNESS:  Yes.  That's correct.

 17    BY MR. MEER:

 18         Q   And there were some people who also during some

 19    part of the day handled administrative issues, paperwork,

11:46 20   correspondence, things like that?

 21              MR. BLACK:  Objection.  Assumes facts not in

 22    evidence.

 23              THE WITNESS:  Yes.  That's correct.

 24    BY MR. MEER:

11:46 25    Q   And these activities -- just to use shorthand so
```

Exhibit A, Page 15

48

Dominique Osborne vs. The Prudential Insurance Company  of America          Date Taken:  7/6/2010

Witness:  Dominique Osborne

```
  1    that we're both talking about the same thing, I'm going

  2    to refer to as "handling calls," and you understand those

  3    are the people who are wearing headsets and either

  4    talking to callers that come in or waiting for callers

11:46  5    that come in.  Is that a fair description of it?

  6         A   Yes.

  7         Q   Okay.  And people who are handling claims are

  8    not wearing a headset, they are handling the claims

  9    process and matching up the claims with the proper

11:47 10    payments to be paid, correct?

 11             MR. BLACK:  Objection.  Misstates prior

 12    testimony.  Vague and ambiguous and misleading.

 13             THE WITNESS:  I would have to disagree because

 14    if we got busy all of a sudden, everybody who was doing

11:47 15    claims -- you could keep your headset on all day because

 16    it was unpredictable because of being a call center.  So

 17    they could be required to jump on the phones in the

 18    middle of doing a claim.  So everyone was -- the job that

 19    was trained to do claims was also trained to be on the

11:47 20    phone at any moment's notice.

 21    BY MR. MEER:

 22         Q   I understand that.

 23         A   Okay.

 24         Q   I just want to --

11:47 25         A   Okay.
```

Exhibit A, Page 16

49

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

| | |
|---|---|
| 1 | Q    Let me describe it like this.  If I were to take |
| 2 | a snapshot of the call center -- if I were to walk in the |
| 3 | call center at 10:00 a.m. while you were working, I would |
| 4 | see some people with headsets on answering calls, right? |
| 11:48  5 | MR. BLACK:  Objection.  Improper hypothetical. |
| 6 | Calls for speculation. |
| 7 | THE WITNESS:  Yes.  That's right. |
| 8 | BY MR. MEER: |
| 9 | Q    And I would see some people without headsets on |
| 11:48 10 | handling claims, right? |
| 11 | MR. BLACK:  Same objection. |
| 12 | THE WITNESS:  Yes.  That's right. |
| 13 | BY MR. MEER: |
| 14 | Q    And I would see some people without headsets on |
| 11:48 15 | handling correspondence or other paperwork, right? |
| 16 | MR. BLACK:  Same objection. |
| 17 | THE WITNESS:  Yes.  That's right. |
| 18 | BY MR. MEER: |
| 19 | Q    And those three activities were in a constant |
| 11:48 20 | state of change throughout the day depending on call |
| 21 | volume or claim volume, correct? |
| 22 | A    Yes.  That's correct. |
| 23 | Q    So if the call volume was particularly high, |
| 24 | then more people were handling calls than if the call |
| 11:48 25 | volume was particularly low, right? |

Exhibit A, Page 17

50

Dominique Osborne vs. The Prudential Insurance Company  of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
     1              A    Yes.  That's right.

     2              Q    People moved from handling calls to handling

     3       claims or to handling correspondence throughout the same

     4       day, right?

11:49 5              A    Yes.  That's right.

     6              Q    There was a weekly schedule that was put out

     7       that stated what activities somebody started on on a

     8       particular day, correct?

     9              A    Yes.  That's correct.

11:49 10              Q    So when you began a workday, you knew where you

    11       were starting and what activity, right?

    12              A    You did, but it wasn't -- it wasn't in black and

    13       white.  There was a lot of gray.

    14              Q    There was an attempt to put people in a starting

11:49 15       activity and that, from what you observed, changed

    16       virtually every day, right?

    17              MR. BLACK:  Objection.  Misstates prior

    18       testimony.  Vague and ambiguous.

    19              THE WITNESS:  Yes.  It could realistically

11:49 20       change because people could get sick and that could

    21       change everything with it being a small call center.

    22       BY MR. MEER:

    23              Q    Or when some people were on their lunch who were

    24       on calls, other people might have to cover calls for

11:50 25       them, right?
```

Exhibit A, Page 18

51

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
         1          A    No, I didn't, because of the pressure -- the
         2     pressure and just like the -- the environment.  It was
         3     like being bullied to where you were afraid to really
         4     ask, "Well, can I get paid if I leave at 4:07?"  Because
12:15    5     it came a point where I used to complain, gosh, I never
         6     get out of here on time.  Even when I have a goal set and
         7     I'm going to start wrapping up my stuff, I would have
         8     other work thrown my way or -- and because I sat close to
         9     two of the supervisors, it was like they were always
12:15   10     asking me things at the end of the day.  I have claims, I
        11     have QAC coming to throw things at me.  So it was like I
        12     was bombarded with things at the end.  Even if I wanted
        13     to prepare to leave, I really didn't have that option
        14     unless I was just going to be like look, tell -- tell
12:15   15     management and tell everyone this will have to wait until
        16     tomorrow.
        17          Q    I understand that you felt as if you needed to
        18     stay.  But on those days when you did stay past 4:00 to
        19     handle claims or answer questions from quality review,
12:16   20     did you ever say to a supervisor or manager, you know, "I
        21     stayed beyond my shift ending time today, how should I
        22     record or am I allowed to record the extra time worked?"
        23          A    No.  No, I didn't go ahead and push the subject.
        24          Q    Well, not push the subject.  You never even
12:16   25     raised it, right?
```

Exhibit A, Page 19

71

Witness:  Dominique Osborne

```
     1            MR. BLACK:  I'm going to object that that
     2      assumes facts not in evidence.
     3            THE WITNESS:  Yes.
     4      BY MR. MEER:
01:27 5         Q   Do you have any reason to believe that this
     6      Exhibit 1, these building access reports are not
     7      accurate?
     8            MR. BLACK:  Objection.  Calls for a legal
     9      conclusion.  Calls for an expert opinion.  Lacks
01:28 10     foundation.
     11           THE WITNESS:  I can never say 100 percent
     12     accurate considering that if other people use my card or
     13     I use somebody's else's card.  But I was -- like we were
     14     discussing earlier, I would say anywhere from 85 to
01:28 15     90 percent -- these records would most likely be 85 to
     16     90 percent accurate.
     17     BY MR. MEER:
     18         Q   Okay.  If you were to look through them, would
     19     you be able to spot specific days that you think are not
01:28 20     accurate?
     21         A   No.  No.  Realistically, I don't know who could
     22     do that.  I know I can't, so no.  I wouldn't be able to
     23     say which days are not accurate.
     24         Q   So when we look through these building access
01:29 25     records, if there is a day when you think that can't be
```

Exhibit A, Page 20

93

Dominique Osborne vs. The Prudential Insurance Company  of America                    Date Taken:  7/6/2010

Witness:  Dominique Osborne

          1    would have to say I can't 100 percent agree with the

          2    times.  I -- I -- I mean, because I don't have anything

          3    that shows -- showed me that -- I mean -- I mean, I can

          4    only trust what these reports say, but I don't know how

01:30     5    accurate they are.  I don't know what the time was when I

          6    badge in.  There wasn't a clock there.  So I don't know.

          7    It could be off by five minutes or it could be -- I mean,

          8    it could be later or earlier.  I -- I don't know that.

          9    BY MR. MEER:

01:30    10        Q   Did you ever keep any separate set of records on

         11    your own showing the times that you arrived at work?

         12        A   No, I didn't.

         13        Q   Okay.  So we have these records.

         14        A   Mm-hmm.

01:31    15        Q   You don't have any separate records that may

         16    show different times?

         17        A   No, I don't.  I just know that, you know, the

         18    times that I roughly got to work.

         19        Q   As I understand your lawsuit, you're claiming

01:31    20    that you were required to come in 10 minutes before your

         21    scheduled shift started at 8:00 a.m.; is that right?

         22            MR. BLACK:  Objection.  The document speaks for

         23    itself.

         24            THE WITNESS:  Anywhere from 10 to 15 minutes

01:31    25    early, if possible.

Exhibit A, Page 21

                                                                    95

Dominique Osborne vs. The Prudential Insurance Company  of America                     Date Taken:  7/6/2010

Witness:  Dominique Osborne

```
        1    BY MR. MEER:
        2         Q    Looking at these records, I'll represent to you
        3    that on all but four days you came in less than 10
        4    minutes before your shift started.  Does that seem
01:31   5    accurate to you?
        6              MR. BLACK:  Objection.  Lacks foundation.  Calls
        7    for speculation.  Assumes facts not in evidence.
        8              THE WITNESS:  It really would be speculation
        9    because I don't remember exactly.  I just know sometimes
01:32  10    I got there 5 minutes until, sometimes 20 minutes.  The
       11    times varies.
       12    BY MR. MEER:
       13         Q    On some days you got to the office at only a
       14    couple of minutes before your shift started, correct?
01:32  15              MR. BLACK:  Objection.  Assumes facts not in
       16    evidence.  Misstates prior testimony.  Lacks foundation.
       17              THE WITNESS:  Yes.  That's correct.
       18    BY MR. MEER:
       19         Q    And on some days you got to the office after
01:32  20    your shift started, correct?
       21              MR. BLACK:  Objection.  Also vague and ambiguous
       22    as to "office."
       23              THE WITNESS:  Yes.  Yes.  That could happen as
       24    well.
01:32  25    BY MR. MEER:
```

Exhibit A, Page 22

96

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
         1        Q    And on some days, you got to the office exactly
         2   at the time that your shift started, correct?
         3        A    Yes.   That's correct.
         4        Q    You were never given any written discipline for
01:32    5   arriving to work too late, correct?
         6        A    No, I wasn't.
         7             MR. BLACK:  Objection.  Vague and ambiguous as
         8   to "late."
         9             THE WITNESS:  No, I wasn't.
01:33   10   BY MR. MEER:
        11        Q    You were never given any sort of discipline
        12   about the time you arrived to the office, correct?
        13        A    No, nothing written.  It was just told verbally.
        14        Q    And although your complaint says that you were
01:33   15   required to be at your office 10 to 15 minutes prior to
        16   8:00 a.m., on most days you first arrived at the office 4
        17   or 5 minutes before 8:00 a.m., correct?
        18             MR. BLACK:  Objection.  Lacks foundation.
        19   Document speaks for itself.  Improper hypothetical.
01:33   20             THE WITNESS:  The policy -- Prudential's
        21   policies were stressed to me by my supervisor to try to
        22   get there 10 to 15 minutes early, especially days I was
        23   going to be on the phone.
        24   BY MR. MEER:
01:34   25        Q    But despite your supervisor telling you to try
```

Exhibit A, Page 23

97

Dominique Osborne vs. The Prudential Insurance Company of America                                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

1    to be at work 10 to 15 minutes early, most of the time

2    you were only 4 or 5 minutes early, correct?

3              MR. BLACK:  Objection.  Asked and answered.

4    Lacks foundation.  Misstates prior testimony.  Documents

01:34 5    speak for themselves.

6              THE WITNESS:  My intention was always to try to

7    get there as soon as I could to try to get within that

8    time frame.  Realistically I wasn't able to because I

9    have children that I have to drop off.  My -- my

01:34 10   daughters, I drop them off at daycare at the time.  I

11   drop my son off at school.  It was always in my best

12   interest to try and do what the company wanted me to do,

13   but not always did I realistically obtain that goal.  It

14   was always something I wanted to do, but not always able

01:34 15   to do what they may have requested me to do.

16   BY MR. MEER:

17        Q   Well, even though they may have requested you to

18   show up earlier, you were never disciplined or demoted or

19   had your pay cut or in any way counseled about the time

01:35 20   that you arrived at the office, right?

21             MR. BLACK:  Objection.  Asked and answered.

22   Misstates prior testimony.

23             THE WITNESS:  No.

24   BY MR. MEER:

01:35 25        Q   You never received any of that discipline or

Exhibit A, Page 24

98

Witness:  Dominique Osborne

|   |   |
|---|---|
| 1 | counseling? |
| 2 |     A   No.  No, I didn't. |
| 3 |     Q   And so looking at -- and we won't go through all |
| 4 | of these records.  But looking at, for instance -- let's |
| 01:35 5 | go to a time after your training ended.  So let's look at |
| 6 | April 27, 2009, and I'll give you the page number on |
| 7 | that.  It should be page 55 of 77. |
| 8 |     A   Okay.  Okay. |
| 9 |     Q   So on April 27th, for instance, you arrived |
| 01:36 10 | about two and a half minutes early, correct? |
| 11 |     A   Yes.  That's correct. |
| 12 |     Q   And then going to the next day, April 28, 2009, |
| 13 | you arrived almost a minute after your shift had started. |
| 14 |     A   Mm-hmm. |
| 01:36 15 |     MR. BLACK:  Objection.  Vague and ambiguous as |
| 16 | to "arrive." |
| 17 | BY MR. MEER: |
| 18 |     Q   Correct? |
| 19 |     A   Yes. |
| 01:36 20 |     Q   And then looking at the next day after that, |
| 21 | April 29, 2009, you arrived at work about four and a half |
| 22 | minutes before your shift started, correct? |
| 23 |     A   Yes.  That's correct. |
| 24 |     Q   And then looking at the next day, April 30, |
| 01:37 25 | 2009, it has your first access at 10:43:37 a.m. |

Exhibit A, Page 25

99

Dominique Osborne vs. The Prudential Insurance Company of America                Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
        1    I was working there yesterday.  I would have a much

        2    more -- it would be clear in my memory.  But I can't tell

        3    you about something from like almost a year and a half

        4    ago.

01:52   5    BY MR. MEER:

        6         Q   Is there any day where you can remember

        7    specifically what time you stopped working?

        8             MR. BLACK:  I'm going to object to that as to

        9    specifically -- Counsel, are you asking her to --

01:53  10    specifically, or are you asking her to estimate?  Do you

       11    want to clarify your question?

       12    BY MR. MEER:

       13         Q   Please answer.

       14             MR. BLACK:  Do you understand the question?

01:53  15             THE WITNESS:  I'm sorry.  Can you repeat it

       16    again?

       17    BY MR. MEER:

       18         Q   When I use the word "specifically," I mean

       19    specifically.  So is there any day specifically when you

01:53  20    can remember the time you stopped working?

       21             MR. BLACK:  Again, objection.  Vague and

       22    ambiguous as to whether "specifically" is being used or

       23    referring to a specific day or a specific time on any

       24    day.

01:53  25             THE WITNESS:  No.  I cannot tell you for a
```

Exhibit A, Page 26

111

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

1      specific day, no.

2      BY MR. MEER:

3          Q    Can you tell me looking at all of these records,

4      if we were to go through day by day showing the time that

01:53 5    you logged out of the telephone queue, can you tell me

6      whether those times are accurate or inaccurate for any

7      given day?

8              MR. BLACK:  Objection.  Vague and ambiguous as

9      to "accurate" as to what.  The question is

01:54 10   unintelligible.

11             THE WITNESS:  I would say no.

12     BY MR. MEER:

13         Q    So the only thing we have to go on regarding the

14     time you stopped work is your own memory, but your own

01:54 15   memory doesn't allow you to recall the times you stopped

16     working on any particular day; is that right?

17             MR. BLACK:  Objection.  That misstates prior

18     testimony.  All you asked this witness is whether she

19     remembers specific days.  You never asked her to estimate

01:54 20   generally.

21             THE WITNESS:  It wasn't something that I saw

22     that I needed to keep my own personal records of.  So --

23     so no.  I -- what you're asking -- I just can't give you

24     the answer that you're wanting to hear.

01:55 25   BY MR. MEER:

Exhibit A, Page 27

112

Witness:  Dominique Osborne

```
        1              THE VIDEOGRAPHER:   The time is 2:38 p.m. and
        2      we're off the record.
        3              (Recess.)
        4              THE VIDEOGRAPHER:   The time is 2:46 p.m. and
02:46   5      we're back on the record.
        6      BY MR. MEER:
        7          Q   Before we took our break, I gave you a copy of
        8      Exhibit 5 which is the daily production log.  Have you
        9      had a chance to take a look at that?
02:47  10          A   No, I haven't.
       11          Q   Taking a brief look at this Exhibit 5 -- it's
       12      13 pages long -- is this a true and correct copy of the
       13      daily production logs that you completed while at
       14      Prudential?
02:47  15          A   Let me go ahead and look at it.  Is this only
       16      for me?
       17          Q   Yes.
       18          A   It is, okay.  Would you just be able to, I
       19      guess, explain maybe each of the columns to me so I could
02:48  20      just make sure I'm understanding this clearly?
       21          Q   Sure.  This is a daily production report which
       22      is for your work beginning on January 2nd, 2009.
       23          A   Mm-hmm.
       24          Q   And there are different types of production --
02:48  25          A   Yes.
```

Exhibit A, Page 28

146

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

| | |
|---|---|
| 1 | Q   -- different types of work done.  There's |
| 2 | claims, there's telephone -- |
| 3 | A   Yes. |
| 4 | Q   -- and then there's correspondence and there's |
| 02:48 5 | also nonproductive time, vacations, PTO time, time spent |
| 6 | in meetings.  And there is a sum of production minutes |
| 7 | for each of these activities. |
| 8 | A   Okay. |
| 9 | Q   The 420 minutes -- if you divide 420 by 60, 60 |
| 02:49 10 | minutes per hour, that comes out to be 420 minutes for |
| 11 | seven hours. |
| 12 | A   Okay. |
| 13 | Q   So, for instance, on January 2nd, 2009, it |
| 14 | indicated that you were doing claims production -- |
| 02:49 15 | A   Mm-hmm. |
| 16 | Q   -- or claims work for seven hours -- |
| 17 | A   Mm-hmm. |
| 18 | Q   -- that you completed three claims -- |
| 19 | A   Mm-hmm. |
| 02:49 20 | Q   -- and that the percent of target is 19 percent. |
| 21 | A   Mm-hmm. |
| 22 | Q   Do you see that? |
| 23 | A   Yes.  Yes, that helps. |
| 24 | Q   So then looking at this, let's look at the next |
| 02:49 25 | day, January 5. |

Exhibit A, Page 29

147

M and M Court Reporters, Inc.  (714)972-2300  Fax (714)972-1616

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
         1        A    Yes.  February 12, okay.

         2        Q    -- there's an entry for Team 800 Number Phone

         3   Production.  Do you see that?

         4        A    Yes.

02:51    5        Q    And that indicates that time that you were

         6   assigned to the telephones?

         7        MR. BLACK:  Objection.  Lacks foundation.

         8   Document speaks for itself.  Assumes facts not in

         9   evidence.

02:52   10   BY MR. MEER:

        11        Q    Is that what that indicates to you, Ms. Osborne?

        12        A    Well, let me go ahead and look at this page

        13   because it does look different than the other one.  Okay,

        14   yeah, this does look more familiar for the things we used

02:52   15   to have to login to access, but this wasn't to logging

        16   time records but strictly for production records.

        17        Q    Well, it also included non-production time such

        18   as training time, correct?

        19        MR. BLACK:  Objection.  Vague and ambiguous as

02:53   20   to "it."

        21        THE WITNESS:  Training was still tied in to

        22   production time.  It's just we may not have completed

        23   claims or what have you.

        24   BY MR. MEER:

02:53   25        Q    Okay.  These daily production reports were your
```

Exhibit A, Page 30

149

Dominique Osborne vs. The Prudential Insurance Company of America                     Date Taken: 7/6/2010

Witness:  Dominique Osborne

| | |
|---|---|
| 1 | requirement to log all work-related activities? |
| 2 | A   Yes.  That's correct. |
| 3 | Q   And just so that we're using the same codes, |
| 4 | when there's an entry for Team 800 Number Phone |
| 02:53 5 | Production, that was the entry that you made for time |
| 6 | spent handling phone calls, right? |
| 7 | A   Yes.  That's correct. |
| 8 | Q   And where there's an entry for batched mail |
| 9 | production, that would be time spent handling |
| 02:54 10 | correspondence, right? |
| 11 | A   Yes.  That's correct. |
| 12 | Q   And then there's a claims production entry that |
| 13 | would be time spent handling claims, right? |
| 14 | A   Yes.  That's right. |
| 02:54 15 | Q   And then team training -- that would be either |
| 16 | one-on-one coaching or a meeting with other colleagues, |
| 17 | correct? |
| 18 | A   Yes.  That's correct. |
| 19 | Q   Okay.  And so looking at all of these dates, you |
| 02:54 20 | filled in the amount of time spent on each of these |
| 21 | different work-related activities per day, correct? |
| 22 | MR. BLACK:  Objection.  Document speaks for |
| 23 | itself.  Lacks foundation as to what the document even |
| 24 | is. |
| 02:54 25 | THE WITNESS:  Yes.  That's correct. |

Exhibit A, Page 31

150

M and M Court Reporters, Inc.  (714)972-2300  Fax (714)972-1616

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken:  7/6/2010

Witness:  Dominique Osborne

BY MR. MEER:

Q   And looking at this document, I know you said earlier that you tried to be as accurate as possible and that with human error no one could be accurate to every minute every day.  But as you look at this report, this appears to be an accurate entry of the amount of time you spent on the various work activities on each of the days listed, right?

MR. BLACK:  Objection.  Misstates prior testimony.  It's compound and unintelligible.

THE WITNESS:  I mean, it's never 100 percent accurate considering it could be sometimes time-consuming to just even be able to write down all of this information and add up the minutes, and then if they didn't add up to try to remember and figure out what you did the previous day or couple of days or what have you. So -- but -- and this was something that we entered into the access system.  But it's just -- I would say if it was based on a percentage, maybe about 70 percent accurate.

BY MR. MEER:

Q   This is the most accurate record that you're aware of showing the amount of time you spent during the day on different work activities, right?

MR. BLACK:  Objection.  Misstates prior

Witness:  Dominique Osborne

```
      1    testimony.  It's leading.  It's intentionally misleading.

      2    And it's confusing and it assumes facts not in evidence.

      3    Sorry.

      4          THE WITNESS:  I would say it would probably be

02:56 5    the closest thing to something being accurate as regards

      6    to some type of record kept for what we did for

      7    production throughout the day.

      8    BY MR. MEER:

      9      Q    There's nothing that you can think of that would

02:56 10   make this more accurate, right?  It's as accurate as you

      11   could possibly make it?

      12         MR. BLACK:  Objection.

      13   BY MR. MEER:

      14     Q    Right?

02:56 15         MR. BLACK:  Objection.  Vague and ambiguous.

      16   It's confusing.  It's misleading.  The document speaks

      17   for itself.  Misstates prior testimony.

      18         THE WITNESS:  It just seemed like a really --

      19   like I guess like an old-fashioned type of system.  I

02:57 20   mean, something -- I mean, I've never used before.  It

      21   was just a very unique, old-fashioned thing, writing down

      22   what you did throughout the day and trying to calculate

      23   the minutes.  But I can't -- I know one thing for sure.

      24   It's never concrete and 100 percent accurate, but you --

02:57 25   it would give you a much better idea of what you did
```

Witness:  Dominique Osborne

1    respond to my attempting to clarify the record.

2              THE WITNESS:  Yes.  Yes.  I understand that he's

3    talking about electronically to put it in the system

4    access.

02:58 5              MR. BLACK:  Okay.

6    BY MR. MEER:

7         Q    So if we were to find this handwritten journal,

8    the handwritten journal to your memory would include the

9    same amount of minutes that you entered electronically,

02:59 10   correct?

11        A    I would say yes.  Sometimes I had questions on

12   them myself because you could go a day or two, just get

13   caught up with doing -- doing your work and stuff because

14   this -- unfortunately with doing these reports, it

02:59 15   affected your time to process -- process claims and what

16   have you and other things that we were required to work

17   on.  But this is the close -- the thing that comes the

18   closest to doing it and sometimes, you know, you can do

19   it every day or sometimes some people would do them

02:59 20   weekly and just copy and enter it into the system.  Me

21   personally, I try to do it -- do it every -- every day or

22   at least every other day.

23        Q    The Prudential policy was to do it every day,

24   correct?

03:00 25        A    Yes.  That's correct.

Dominique Osborne vs. The Prudential Insurance Company of America                          Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
 1          Q    And there is no other set of records that you're
 2     aware of that would have a more accurate representation
 3     of the amount of time you spent on these various daily
 4     activities, right?
03:00  5          A    No, not that I know of.
 6          Q    And there is nothing in your memory that
 7     indicates after reviewing this Exhibit 5 that the amount
 8     of time entered is incorrect for any particular day?
 9               MR. BLACK:  Objection.  The document lacks
03:00 10    foundation.  It's vague and ambiguous.
11               THE WITNESS:  I'm sorry.  Can you repeat the
12     question again?
13     BY MR. MEER:
14          Q    Sure.  As you look at this document and it's got
03:01 15    an amount of time listed for every day, there aren't any
16     days that indicate to you "I know that doesn't seem
17     right, it says that I spent 62 minutes, an hour and
18     two minutes doing claims production on February 13th, and
19     I -- I recall that I must have spent nine hours doing
03:01 20    claims production that day."  There's nothing about these
21     entries on Exhibit 5 that indicate to you it being
22     inaccuracy, right?
23               MR. BLACK:  Objection.  The question is
24     compound.  There's at least three questions in there.
03:01 25              THE WITNESS:  Not that I know of.
```

Exhibit A, Page 35

155

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

| | |
|---|---|
| | 1 |

```
           1    right?

           2           MR. BLACK:  Objection.  Documents speaks for

           3    themselves.  The program speaks for itself.  And it

           4    misstates prior testimony.  It is intentionally

03:08      5    misleading.

           6           THE WITNESS:  These reports were mainly just to

           7    list the production of the work that was done for the

           8    day.

           9    BY MR. MEER:

03:08     10      Q   Well, and they were also to list the amount of

          11    time spent on each item so that the person's productivity

          12    could be measured against what was actually produced that

          13    day, correct?

          14           MR. BLACK:  Objection.  It's leading.  I'm not

03:08     15    even sure if that's a question.

          16    BY MR. MEER:

          17      Q   Go ahead and answer.

          18      A   Yes.  That's correct.

          19      Q   And so the amount of time actually spent on a

03:09     20    particular task was important to be recorded accurately

          21    so that somebody's productivity could be assessed

          22    accurately, right?

          23      A   Yes.  That's the way they measured it there, so

          24    yes.

03:09     25      Q   And so this wasn't a system where someone was
```

Exhibit A, Page 36

160

Witness:  Dominique Osborne

```
 1      just supposed to routinely record seven hours a day, they

 2      were supposed to record the actual amount of time spent,

 3      right?

 4              MR. BLACK:  Objection.  Vague and ambiguous as

03:09  5   to "time spent."  Asked and answered and misstates prior

 6      testimony.

 7              THE WITNESS:  Yes.  That's correct.

 8      BY MR. MEER:

 9          Q    And when you look at all of these dates on the

03:09 10   daily production report, are there any dates where you

11      can remember spending more time than the amount recorded

12      on the daily production report?

13          A    No.

14              MR. BLACK:  Objection -- I'm sorry.  Objection.

03:09 15   Vague and ambiguous as to spent time.  And vague and

16      ambiguous in general.

17              THE WITNESS:  No.  I wouldn't be able to go

18      ahead and say on a specific date what I was doing and

19      what have you that sticks out in my mind.

03:10 20   BY MR. MEER:

21          Q    On the dates when you were working beyond the

22      seven hours of time recorded on the production report,

23      what is the highest amount of time you worked without

24      recording it?

03:10 25              MR. BLACK:  Objection.  Vague and ambiguous as
```

Exhibit A, Page 37

161

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
           1    BY MR. MEER:
           2        Q    And so if in a worst case scenario you were
           3    required to work an extra 20 minutes per day without
           4    getting compensated for it in any way, that would be
03:14      5    100 minutes per week, right?
           6            MR. BLACK:  Objection.
           7    BY MR. MEER:
           8        Q    20 times 5.
           9            MR. BLACK:  Objection.  It's compound.  It's a
03:14     10    rambling question.  It's unintelligible.  It's unclear
          11    whether counsel is asking whether the minutes are
          12    included from the morning and the afternoon.
          13    BY MR. MEER:
          14        Q    Go ahead and answer.
03:15     15        A    Okay.  Well, it wouldn't be every day, but I
          16    mean that I stayed, I mean, 15, 20 minutes later.  But, I
          17    mean, on average, I left anywhere from 4:07 to 4:15 each
          18    day.
          19        Q    And so on staying late, if we took the worst
03:15     20    case scenario -- the time when you worked the most and
          21    were compensated the least -- it would be 15 minutes
          22    five days a week, right?
          23            MR. BLACK:  Objection.  Vague and ambiguous and
          24    unintelligible.
03:15     25            Only answer if you understand the question.
```

Exhibit A, Page 38

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
    1              THE WITNESS:  I can't answer that.

    2     BY MR. MEER:

    3         Q    Okay.  Let me break it down.

    4         A    Okay.

03:15  5         Q    Your lawsuit is for time that you say you worked

    6     when you weren't paid.  And so my question -- and it's

    7     not meant to be tricky and it's not meant to be complex.

    8     I'm trying to figure out how much time you worked without

    9     being paid.  So I want to try and ask that on a daily

03:16 10     basis or a weekly basis.

   11              So on the worst day you worked 20 minutes of

   12     time without being paid, right?

   13              MR. BLACK:  I'm going to object.  It's vague and

   14     ambiguous as to how that 20 minutes is calculated.  If

03:16 15     you can just clarify for the record.

   16     BY MR. MEER:

   17         Q    Using a watch that has a minute hand and a

   18     second hand calculating the amount of time on that watch

   19     that is accurate and it's a watch you own, how much extra

03:16 20     time did you work on the worst day?

   21         A    On the worst day?  I would say it could be up to

   22     like 13, 15 minutes.

   23         Q    Okay.  And if this was the worst case scenario

   24     week -- let's say 15 minutes of extra time worked each

03:17 25     day without being paid -- that would be 15 minutes times
```

Exhibit A, Page 39

166

M and M Court Reporters, Inc.  (714)972-2300  Fax (714)972-1616

Witness:  Dominique Osborne

1    five days a week, right?

2         A    Yes.

3         Q    You never had to work weekends, right?

4         A    No, I didn't have to work weekends.

03:17 5   Q    You were always on a five-day week?

6         A    Yes.  That's correct.

7         Q    So 15 minutes extra per day times five days a

8    week would be one hour and a half, right?

9         A    Yes.

03:17 10  Q    No.

11        A    An hour and a half, 15 minutes?

12        Q    Monday, 15 minutes; Tuesday --

13        A    An hour.

14        Q    -- 30 minutes; Wednesday, 45 minutes; Thursday,

03:17 15  1 hour; Friday, 1 hour and 15 minutes.

16        A    Okay.

17        Q    It is a complex question, I guess.  So you were

18   working the worst amount of uncompensated time every day

19   of the workweek, that would be 15 minutes per day or

03:18 20  1 hour and 15 minutes per week, right?

21        A    Yes, roughly about that.

22        Q    Okay.  And your rate of compensation per hour

23   was $19.87, right?

24        A    Something -- I think it was like 19.50 or

03:18 25  something, but you're close.

Exhibit A, Page 40

167

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
        1           Q    Let's say your rate of compensation was always

        2      at $19 an hour or 19.50 per hour -- between those two,

        3      right?

        4           A    Yes.

03:18   5           Q    And so that was your rate throughout your

        6      employment.  It never went up, never went down?

        7           A    That's correct.

        8           Q    And on your paychecks, you got paid every two

        9      weeks, correct?

03:19  10           A    Yes.  That's correct.

       11           Q    And so you automatically got paid for 37 1/2

       12      hours per week, right?

       13           A    Yes.

       14           Q    And so if you had worked those extra 15 minutes

03:19  15      five days instead of getting paid for 37 1/2 hours, it

       16      should be 38 hours and 45 minutes, right?

       17           A    I'm sorry.  You're talking about the extra time

       18      added on --

       19           Q    Yes.

03:19  20           A    -- that I stayed there?

       21                MR. BLACK:  I'm just going to object that the

       22      math is correct.

       23      BY MR. MEER:

       24           Q    Well, we can -- let's do it the hard way.  This

03:19  25      is like why my mother would want me to go to medical
```

Exhibit A, Page 41

168

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
         1    school instead of law school, but this is -- if there's
         2    37 1/2 hours per week, that's what you recall from your
         3    paychecks, right?
         4        A   Yes.
03:20    5        Q   And we just did the math for 15 minutes times
         6    five days is an hour and 15 minutes.
         7        A   Yes.
         8        Q   Okay.  So 37 1/2 -- we add the hour.  That's 38.
         9    And then we add the extra 15 minutes.  That makes it 38
03:20   10    hours and 45 minutes.
        11        A   Yes.
        12        Q   So instead of being paid 37 1/2 hours per week
        13    on the worst weeks when you were working the most time
        14    without being paid, you should have been paid 38 hours
03:20   15    and 45 minutes per week?
        16        A   Yes.  That's correct.
        17        Q   And your paychecks were every two weeks.  So you
        18    got paid for 75 hours regularly every two weeks, right?
        19        A   That's right.
03:21   20        Q   The 37 1/2 plus 37 1/2 is 75?
        21        A   Yes.  That's correct.
        22            MR. MEER:  Let's mark as Exhibit 6 a document
        23    referred to as "Monthly Performance Reports."
        24            (Deposition Exhibit 6 was marked for
03:21   25            identification by the court reporter.)
```

Exhibit A, Page 42

169

Dominique Osborne vs. The Prudential Insurance Company  of America                    Date Taken:  7/6/2010

Witness:  Dominique Osborne

1    this is -- like my home computer, for example, that --

2    what you're saying would definitely merit that.  But with

3    regards to at the office, at Prudential, I knew what

4    systems were the fast ones and which ones were slow and

04:02  5    it didn't really matter the order.

6    BY MR. MEER:

7        Q    Okay.  The Lotus Notes system -- how long did

8    that take to get up and running?

9        A    It didn't take that long once I figured out what

04:03 10    the password was.  It was one of those easy passwords

11    like you could have synchronized with other passwords so

12    it wasn't something that -- if I remembered it right

13    away, then I could get in right away.

14        Q    Less than five seconds, less than ten seconds?

04:03 15        A    I would say probably like two minutes.

16        Q    And if you remembered the password, it would be

17    less than two minutes?

18            MR. BLACK:  Objection.  Asked and answered.

19            THE WITNESS:  I would say it could -- it would

04:03 20    take -- I mean, that's with knowing the password.  Up to

21    two minutes for everything to load into the system.

22    BY MR. MEER:

23        Q    And the telephone queue -- how long did it take

24    to load into that assuming no human error, that you

04:04 25    remembered the password, that you were able to type at a

Exhibit A, Page 43

192

M and M Court Reporters, Inc.  (714)972-2300  Fax (714)972-1616

Dominique Osborne vs. The Prudential Insurance Company  of America                    Date Taken:  7/6/2010

Witness:  Dominique Osborne

1      regular speed, all of that?

2          A    It probably took about 15, 20 seconds.  It

3      didn't take that long.

4          Q    And the ABC system -- how long did that take to

04:04 5  logon to?

6          A    Probably like a minute, minute and a half.

7          Q    The CFE system -- how long did that take to

8      logon to?

9          A    That could take a little bit longer.  It could

04:04 10 take maybe about two to three minutes.

11         Q    And the Pride system -- how long did that take

12     to logon to?

13         A    That could take some time.  It could take

14     five minutes, sometimes seven minutes.  It took a long

04:05 15 time.

16         Q    And what percentage of the time in the morning

17     did you have to logon to the Pride system?

18         A    I would say probably maybe a good 30, 40

19     percent.

04:05 20       Q    So the majority of the time you didn't need to

21     logon to the Pride system for the beginning of the shift?

22         A    No.  No.

23         Q    And that statement is correct?

24         A    Yes.

04:05 25       Q    And so at the beginning of the shift, the

Witness:  Dominique Osborne

```
      1    majority of the time you had to logon to Lotus Notes?

      2         A   I would say yes, I always logged in to Lotus

      3    Notes.  That was just something, yes.

      4         Q   And the beginning of the shift, if you were on

04:06 5    telephones, you had to logon to the telephone queue IP

      6    Agent?

      7         A   Yes.  That's correct.

      8         Q   And the beginning of the shift, if you were on

      9    phones, what percentage of the time did you have to be

04:06 10   logged on to the ABC system?

      11        A   100 percent.

      12        Q   And the beginning of the shift, what percentage

      13   of the time did you have to logon to the CFE system if

      14   you were on the phones?

04:06 15        A   100 percent.

      16        Q   So on the dates when you had to begin your shift

      17   on telephones, the majority of the time it was Lotus

      18   Notes which could take up to two minutes, the telephone

      19   queue IP Agent which would take 15 or 20 seconds, the ABC

04:06 20   system which could take a minute to a minute and a half,

      21   and the CFE system which could take two to three minutes;

      22   is that right?

      23        A   Yes.  That's right, yes, to get all of these

      24   systems up, yes.

04:07 25        Q   And you didn't have to wait for one program to
```

<span style="color:blue">Exhibit A, Page 45</span>

194

Witness:  Dominique Osborne

1    evidence.

2              THE WITNESS:  No.  I just don't ever personally

3    remember getting on the computer and being able to have

4    all my systems up in four minutes.

04:15  5    BY MR. MEER:

6         Q    And so in order to be considered logged on by

7    8:00 a.m., you might still be logging on to programs

8    after 8:00 a.m., right?

9              MR. BLACK:  Objection.  Vague and ambiguous as

04:16 10    to what "logged on" means.

11              THE WITNESS:  Yes.  That's correct.

12    BY MR. MEER:

13         Q    And you were paid for that time because it was

14    after 8:00 a.m., right?

04:16 15         A    Yes.  I was paid once -- at 8:00 a.m. at my

16    original shift.  I wasn't paid for the time prior to

17    that.

18         Q    So if you got into the office at 7:58 a.m. and

19    you were up and running on Internet Explorer by 8:02

04:16 20    a.m., then you were already being paid as of 8:00 a.m. to

21    logon to the other programs, right?

22              MR. BLACK:  Objection.  The question is

23    compound.  Assumes facts not in evidence.  It's vague and

24    ambiguous.

04:16 25              THE WITNESS:  I was just strictly paid from

Exhibit A, Page 46

202

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness: Dominique Osborne

1    8:00 a.m.  I wasn't paid for coming in early to start my

2    systems and get them running earlier.

3    BY MR. MEER:

4        Q    You never had an occasion that you can recall

04:17 5    where all of your systems were up and running by

6    8:00 a.m., right?

7            MR. BLACK:  Objection.  It's vague and ambiguous

8    by all systems "up and running."

9            THE WITNESS:  The only way that would be

04:17 10   possible is if you forgot to turn your computer off the

11   night before and your systems were all up the following

12   day.  You just turned it -- you turned -- you just -- I

13   mean, you not even turn anything.  You use the mouse and

14   it came up and you put your password to login.  That

04:17 15   would be the only way realistically that would be up.

16   But that was not what Prudential's policy was.  They

17   wanted us to go ahead and turn them off each night.  But

18   every now and then you might have where you thought you

19   turned it off and you didn't and you just forgot or what

04:18 20   have you.

21       Q    But if somebody was following the policy

22   articulated at the call center where you worked, they

23   could have logged on to just one of those systems by

24   8:00 a.m. and then logon to the other systems after

04:18 25   8:00 a.m., right?

Exhibit A, Page 47

203

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
       1            MR. BLACK:  Objection.  The question is vague

       2     and ambiguous.  It's compound and it's intentionally

       3     misleading.

       4            THE WITNESS:  Yes.  That's true.

04:18  5     BY MR. MEER:

       6        Q   And so if it took 15 to 20 seconds to logon to

       7     IP Agent, somebody could show up 15 to 20 seconds before

       8     8:00 and be up and running on IP Agent by 8:00, right?

       9            MR. BLACK:  Objection.  "Up and running" is

04:18 10     vague and ambiguous and it misstates prior testimony.

      11            THE WITNESS:  They could be logged in to the

      12     system earlier, but it doesn't necessarily mean they were

      13     getting phone calls.

      14     BY MR. MEER:

04:19 15        Q   But if somebody needed to be logged on to any

      16     one of the programs at 8:00, they could -- since you

      17     mentioned that IP Agent, the telephone queue was the

      18     shortest -- 15 to 20 seconds -- if they arrived 30

      19     seconds before 8:00, then they could be logged on to the

04:19 20     telephone queue by 8:00?

      21            MR. BLACK:  Objection.  The question assumes

      22     facts not in evidence.  Lacks foundation.  And it

      23     misstates prior testimony.

      24            THE WITNESS:  I'm sorry.  Could you repeat it

04:19 25     again?
```

Exhibit A, Page 48

204

Dominique Osborne vs. The Prudential Insurance Company of America                                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

BY MR. MEER:

    Q   Sure.  If the telephone queue took 15 to 20
seconds to logon to, then if somebody arrived 30 seconds
before 8:00 a.m., they could be logged on to the
telephone queue at 8:00 a.m.?

    A   Yes.

    MR. BLACK:  Same objections.

    THE WITNESS:  Yes.  They could be logged into
the phone system, but you would still have to be, you
know -- it still would definitely take time for you to
login to your computer systems.

BY MR. MEER:

    Q   And you could login to those other computer
systems after 8:00 a.m., right?

    A   Yes.  You could go ahead and do that.

    Q   And you were counseled a few times for not
turning off or not logging out of your computer in the
evening, correct?

    A   Yes.  That's correct.

    Q   Now, in order to avoid having telephone calls go
beyond your shift, you could logout of the telephone
queue before 4:00 p.m., correct?

    A   Well, normally, if you were on a phone call, I
mean, it just -- it just really depends.  I mean, if you
had a phone call that was at 3:57, you knew realistically

Exhibit A, Page 49

205

Witness:  Dominique Osborne

```
        1    that call was going to go over your shift.  You had to

        2    take the phone call.  You can't tell the participant "I

        3    have to leave in three minutes, I'll call you back the

        4    next day."  You had to take the phone call even if it

04:21   5    went past your shift.  But we were still required to --

        6    to just stay on the phone until 4:00.  I mean, I remember

        7    there were times where I was thinking I wasn't going to

        8    get a phone call past 4:00 and I did.  I'm still

        9    through -- through the phone system and I still had to

04:21  10    help the participant.

       11        Q   But if you could logout of the systems in

       12    whatever sequence or order you wanted to -- if you wanted

       13    to avoid calls that went after 4:00, the first thing you

       14    would logout of would be IP Agent because once you're out

04:21  15    of that you're out of the call queue, right?

       16            MR. BLACK:  Objection.  Assumes facts not in

       17    evidence.  Incomplete hypothetical.  Calls for

       18    speculation and is misleading.

       19            THE WITNESS:  You could basically -- you

04:22  20    wouldn't even necessarily have to logout.  You can stay

       21    into -- I forget what it was called there.  It might have

       22    been like "not ready" or "wrap up" or something like that

       23    to where you could still be in the system but where you

       24    block from not getting anymore phone calls while you're

04:22  25    wrapping up your work.
```

Dominique Osborne vs. The Prudential Insurance Company  of America                    Date Taken:  7/6/2010

Witness:  Dominique Osborne

```
         1              THE WITNESS:  I would say -- it could have taken

         2      over five minutes.  Because it seems like 4:07 was --

         3      always seemed like my target number to where I was just

         4      like okay, I've been here for seven minutes past my

04:26    5      shift, I'm not getting paid and no one is really

         6      concerned about paying me for fighting with this

         7      computer.  So I'm like -- I have to go because I would

         8      have to go pick up my children.

         9      BY MR. MEER:

04:26   10          Q   I'm just trying to get an amount of time.

        11          A   Yes.

        12          Q   I'll ask you about --

        13              MR. BLACK:  She's giving it to you.

        14      BY MR. MEER:

04:26   15          Q   So on the longest amount of time, it was seven

        16      minutes?

        17              MR. BLACK:  Objection.  Misstates prior

        18      testimony.  Lacks foundation and is misleading.

        19              THE WITNESS:  It was an average of seven

04:26   20      minutes.

        21      BY MR. MEER:

        22          Q   And on days when it didn't freeze and things

        23      logged out correctly, it could be done in less than two

        24      minutes?

04:26   25              MR. BLACK:  Objection.  Misstates prior
```

Exhibit A, Page 51

210

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
  1    testimony.

  2            THE WITNESS:  I would say within three minutes.

  3    BY MR. MEER:

  4        Q    These problems that you had logging out, they

04:27 5    were specific to the computer assigned to you?  It wasn't

  6    everyone at the call center, right?

  7        A    Yes.  That's correct.

  8        Q    And so the other people around you were able to

  9    logon and logoff much quicker than you were?

04:27 10           MR. BLACK:  Objection.  Assumes facts not in

  11   evidence.

  12           THE WITNESS:  That I have no idea.  I just know

  13   at the end of the day what my main focus was.  I wasn't

  14   observing how everyone else was getting out of their

04:27 15   computer.  I just know I was having problems with mine

  16   and I addressed it to my supervisors multiple times and

  17   it just always seemed to be an ongoing issue.

  18   BY MR. MEER:

  19       Q    You went to the gym sometimes with P.J., right?

04:27 20       A    Yes.

  21       Q    And on those days, she was able to logout of her

  22   computer more quickly than you were, right?

  23       A    Well, I didn't ask her directly if she had

  24   problems logging out of her computer or what have you.  I

04:28 25   just know that it was just an ongoing frustration with my
```

Exhibit A, Page 52

211

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010
Witness:  Dominique Osborne

1    something.  I don't remember him saying "Okay, let's

2    everybody -- let's go home."  That I just --

3         Q    On days where you were not on a call, you could

4    start logging out at 3:50 p.m., right?

04:30 5    A    Yeah.  I mean, we still -- we had to go ahead

6    and, you know, finish our work or, you know, pretty much

7    just get any paperwork we had organized, put back in our

8    desk or what have you, start logging out of your systems

9    if we didn't have a phone call or whatever.  But

04:31 10   Prudential always made sure they could squeeze every

11   minute out of you.

12        Q    But you said there were some days when people

13   from quality review asked you a question or some days

14   when you got a late call just toward the end of the

04:31 15   shift.  But on the other days when you had no one asking

16   you questions and no one on the phone, you could start

17   logging out at ten minutes of 4:00, right?

18             MR. BLACK:  Objection.  Assumes facts not in

19   evidence.  Misstates prior testimony.  Misleading and

04:31 20   leading.

21             THE WITNESS:  It was very rare.  It would have

22   been something I might have decided to do if I had an

23   obligation to where I had an appointment where I needed

24   to just be really leaving or to make sure I got out of

04:32 25   there on time.  But it definitely was not on a regular

M and M Court Reporters, Inc.  (714)972-2300  Fax (714)972-1616

Dominique Osborne vs. The Prudential Insurance Company  of America                    Date Taken:  7/6/2010

Witness:  Dominique Osborne

BY MR. MEER:

Q    This Exhibit 7 also discusses that your quality percentage was below acceptable.  You were counseled about that, correct?

04:53 5         MR. BLACK:  Objection.  Vague as to time, date.

THE WITNESS:  Yes.  We were always -- it seemed like every single week was a week of being counseled about production.

BY MR. MEER:

04:53 10    Q    Well, your production and your quality were the lowest of everyone at the call center, right?

MR. BLACK:  Objection.  Assumes facts not in evidence.  Lacks foundation.  It's argumentative.

THE WITNESS:  That I -- that I have no idea on.

04:54 15         MR. MEER:  Let's mark as Exhibit 8 copies of your pay stubs.

(Deposition Exhibit 8 was marked for identification by the court reporter.)

BY MR. MEER:

04:54 20    Q    Have you seen these pay stubs prior to today?

A    Yes.

Q    And just to get an accurate pay rate on there, on page 2 of this, it indicates that you had a pay rate of $19.48.  Is that accurate?

04:55 25    A    Yes.  It looks like it's 48.  It looks like 49

M and M Court Reporters, Inc.   (714)972-2300  Fax (714)972-1616

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

| | |
|---|---|
| 1 | on one of them, but it's a penny. |
| 2 | Q   And when you were paid every two weeks, were you |
| 3 | paid electronically or did you get a check? |
| 4 | A   I do remember the first check came in the mail |
| 04:55 5 | and it was for paid -- I was paid for one week and then |
| 6 | after that I started getting direct deposit |
| 7 | electronically. |
| 8 | Q   And when you got direct deposit electronic |
| 9 | payment, did you receive a copy of those pay stubs? |
| 04:55 10 | A   You would have -- well, for the first initial |
| 11 | paycheck when I started, the one that was mailed to my |
| 12 | home.  It had a paycheck stub.  But in the future, you |
| 13 | would have to pretty much login to the system if you |
| 14 | wanted to go and -- to review your paycheck stubs.  So it |
| 04:56 15 | wasn't necessarily something I did all the time, |
| 16 | investigate because the pay was pretty much the same. |
| 17 | Q   But you knew how to login to the system at |
| 18 | Prudential in order to pull up a copy of your electronic |
| 19 | pay stub, correct? |
| 04:56 20 | A   Yes.  That's correct. |
| 21 | Q   And what was the system called that you logged |
| 22 | in to in order to see your pay? |
| 23 | A   I'm thinking -- I want to say it might have been |
| 24 | Self Service. |
| 04:56 25 | MR. BLACK:  Only answer if you know.  Don't |

Exhibit A, Page 55

225

M and M Court Reporters, Inc.  (714)972-2300  Fax (714)972-1616

Dominique Osborne vs. The Prudential Insurance Company  of America                    Date Taken:  7/6/2010
Witness:  Dominique Osborne

1    would have to stay past my shift to make up the time.  I

2    never was -- never was I just given something for free in

3    regards to saying oh, I come -- I'm a half an hour or

4    hour late to work and pretend that I wasn't there.  I had

04:59 5    to make up that time.

6         MR. BLACK:  Dominique, just make sure you answer

7    his questions specifically.

8    BY MR. MEER:

9         Q    On the dates when you were three minutes or five

04:59 10    minutes or ten minutes late, you never told any

11    supervisor or manager to adjust your time, right?

12         MR. BLACK:  Objection.  Intentionally

13    misleading.  Lacks foundation.  It's argumentative.

14    Assumes facts not in evidence and is intended to

05:00 15    intimidate the witness.

16         THE WITNESS:  No, I didn't ask anyone.

17    BY MR. MEER:

18         Q    So you got that extra time without having to

19    make it up at some other point during the shift, right?

05:00 20         A    Those were --

21         MR. BLACK:  Objection.  Vague and ambiguous as

22    to "extra time."  The whole question is vague and

23    ambiguous and irrelevant.

24         THE WITNESS:  Those were not my intentions.  My

05:00 25    intentions was just to do my work and then be able to go

Exhibit A, Page 56

228

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken:  7/6/2010

Witness:  Dominique Osborne

```
         1        A   Yes, I'm sure it did.

         2            MR. BLACK:  Dominique, you need to only answer

         3    if you know.  Don't speculate, don't guess.  Don't say

         4    "I'm sure it did."  Did it or not?  If you don't know,

05:12    5    say you don't know.

         6            THE WITNESS:  I would say yes.

         7            MR. MEER:  Didn't work.  Okay.

         8            MR. BLACK:  Do you understand what I'm asking?

         9            THE WITNESS:  Yes.  I completely understand,

05:13   10    yes.

        11            MR. BLACK:  All right.

        12            THE WITNESS:  Yes, they do.

        13    BY MR. MEER:

        14        Q   And the Prudential electronic intranet system

05:13   15    also had a section on payroll and overtime, correct?

        16        A   I'm sure it did.  I didn't review it, though.

        17            MR. BLACK:  Dominique, look.  This is very

        18    important.

        19            THE WITNESS:  Okay.

05:13   20            MR. BLACK:  Do not guess to his questions.  It

        21    does sound like the way you're answering the questions

        22    that you are guessing.

        23            THE WITNESS:  Okay.  It's just been a really

        24    long time and so --

05:13   25            MR. BLACK:  If you know, then you can answer the
```

Exhibit A, Page 57

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

```
 1          Q    That was not a guess.  You are sure that there
 2     was a policy regarding payroll and timekeeping, right?
 3          A    Yes.
 4          Q    And there were also policies regarding non-
05:14  5     discrimination and harassment and other HR issues, right?
 6          A    Yes.
 7          Q    And in connection with your performance
 8     evaluations, you reviewed the company intranet policies
 9     regarding performance standards, right?
05:14 10        A    I mainly focused on the ones that we were
11     required to do.  Like we had one, for example, on like
12     ethics where it asks you a little quiz at the end and
13     things like that.  I don't recall doing one for -- for
14     payroll and overtime, something to review.  That's
05:15 15     probably -- would have been the time I would have taken
16     the opportunity to review those in thorough detail.
17          Q    Did you have an understanding -- and I'm not
18     asking as a lawyer -- but did you have an understanding
19     as an employee as to the difference between overtime pay
05:15 20     and straight-time pay?
21               MR. BLACK:  Objection.  Calls for a legal
22     conclusion.
23               THE WITNESS:  I don't remember asking.
24     BY MR. MEER:
05:15 25        Q    From just your knowledge of prior jobs, did you
```

**Exhibit A, Page 58**

240

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

| | |
|---|---|
| 1 | have an understanding that someone could have a regular |
| 2 | or straight-time pay rate and then an overtime pay rate? |
| 3 | MR. BLACK:  Objection.  Asked and answered. |
| 4 | Calls for a legal opinion. |
| 05:15  5 | THE WITNESS:  I would say yes, but this job was |
| 6 | completely different as regards to recording time |
| 7 | considering we didn't do it ourselves.  I always have had |
| 8 | a place where I was able to take liberty of entering my |
| 9 | own time. |
| 05:16 10 | BY MR. MEER: |
| 11 | Q   And you understood -- again, not as a lawyer -- |
| 12 | but just from your prior experience that overtime applied |
| 13 | to work over 40 hours a week, right? |
| 14 | MR. BLACK:  Objection.  Calls for a legal |
| 05:16 15 | conclusion.  Asked and answered. |
| 16 | THE WITNESS:  Well, I know it can also be -- I |
| 17 | believe in the state of California, even if you work over |
| 18 | eight hours a day -- but since I didn't work over eight |
| 19 | hours a day, I guess it was for unpaid time.  But I |
| 05:16 20 | didn't know how that worked and no one ever clarified |
| 21 | that with me at Prudential. |
| 22 | BY MR. MEER: |
| 23 | Q   But based on your understanding that overtime |
| 24 | was over 40 hours a week, there were not weeks at |
| 05:17 25 | Prudential when you worked over 40 hours, correct? |

Exhibit A, Page 59

241

Witness:  Dominique Osborne

1           MR. BLACK:  Objection.  Calls for a legal and

2    expert opinion.  Assumes facts not in evidence.

3    Misstates prior testimony.

4           THE WITNESS:  No, I didn't work over 40 hours a

05:17 5    week at Prudential.

6    BY MR. MEER:

7       Q   And you didn't work over eight hours a day at

8    Prudential either, right?

9           MR. BLACK:  Objection.  Vague and ambiguous as

05:17 10   to work overtime at Prudential.

11          THE WITNESS:  The only way I would have stayed

12   over eight hours is if I had to make up an hour and maybe

13   at the end of the shift I might have got out of there,

14   for example, at 5:07.

05:17 15   BY MR. MEER:

16      Q   Okay.

17      A   And so that happened on occasion.

18      Q   More than two or three times?

19      A   Gosh.  I really can't answer.  But I want to say

05:18 20   more than two or three times.

21      Q   More than six times?

22      A   I couldn't put a number on it, but I want to say

23   more than two or three.  Maybe roughly around five, but

24   that's not -- but that's only me guessing and we're

05:18 25   talking about going a year to two years back.

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

      1    with and they still didn't even want you to do that.  It

      2    was just --

      3         Q    But you ultimately were successful when you had

      4    questions that couldn't be answered by people who called

05:26 5    the call center or questions about how to handle claims?

      6    You were able to navigate through Prudential in order to

      7    find somebody who could help you, right?

      8              MR. BLACK:  Objection.  Irrelevant.

      9              THE WITNESS:  I could, but it wasn't enjoyable

05:27 10   sometimes.

      11   BY MR. MEER:

      12        Q    Okay.  I'll stipulate that I've taken 1,000

      13   depositions and I haven't yet heard a person say that

      14   their job was enjoyable or without stress.  And so I -- I

05:27 15   get that.

      16             But you understood at Prudential that if you had

      17   wanted to try to navigate to find out who the appropriate

      18   person is for payroll issues or human resources issues,

      19   there were resources to find those people, right?

05:27 20            MR. BLACK:  Objection.  Asked and answered.

      21   It's argumentative.  Federal law controls.

      22             THE WITNESS:  It's just something to where I --

      23   I didn't want to be, I guess, going behind someone's back

      24   or questioning somebody's authority, considering

05:27 25   everything that we were going through on a day-to-day

                                                      Exhibit A, Page 61

                                                                      249

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

          1   basis.  So it was just something that I just -- I just

          2   left alone even though I saw that it wasn't right.

          3   BY MR. MEER:

          4       Q   But you understood Prudential was a -- a multi-

05:28     5   billion dollar Fortune 500 company, right?

          6       A   I never looked at it that way.

          7       Q   You thought of it as a big place, you had said

          8   that you worked at 21st Century Insurance, you knew

          9   Prudential was a big corporate employer, right?

05:28    10       A   Yes, I knew that it was, but it was -- the way

         11   it was set up was completely different compared to me

         12   being at 21st Century.  I mean, we had a doctor on-site

         13   if you got hurt.  We had everything there versus at

         14   Prudential -- we didn't have those things.

05:28    15       Q   Well -- but you didn't think that Charlene Frank

         16   was the only person in human resources at this enormous

         17   company who would be able to respond to questions about

         18   your pay or how to record time, right?

         19            MR. BLACK:  Objection.  Compound.

05:29    20            THE WITNESS:  I really didn't -- you know,

         21   really know, you know, as regards to her.  It wasn't like

         22   I knew about her from day one.  And that's normally when

         23   you're concerned about your pay and what have you.  And I

         24   didn't learn about -- you get introduced to her, I say,

05:29    25   maybe a few months down the line.

                                                        Exhibit A, Page 62

                                                                        250

```
        1    BY MR. MEER:
        2        Q    Well, either somebody said, "Ms. Osborne, you'll
        3    be able to earn incentive payments" or they didn't say
        4    it.
06:34   5            MR. BLACK:  Same objections.
        6            Only answer if you know.  Don't speculate.
        7            THE WITNESS:  I really don't know.
        8    BY MR. MEER:
        9        Q    As far as you understood, your productivity
06:34  10    targets would not have any impact on your daily or weekly
       11    compensation, right?
       12            MR. BLACK:  Objection.  Vague and ambiguous as
       13    to "daily or weekly targets."  Vague and ambiguous as
       14    to -- strike that.
06:35  15            THE WITNESS:  I'm sorry.
       16            MR. BLACK:  Answer if you can.
       17            THE WITNESS:  I'm sorry.  Can you ask the
       18    question?
       19    BY MR. MEER:
06:35  20        Q    You were paid the same amount of money no matter
       21    how many calls you handled or how many claims you
       22    processed, right?
       23        A    Yes.  Yes.  That's correct.
       24        Q    Some call centers have an incentive program
06:35  25    where they pay an employee per call.  The employee gets a
```

Exhibit A, Page 63

284

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness:  Dominique Osborne

1    base wage and then maybe a dollar or a couple of dollars

2    for each call that they complete.  There wasn't any

3    program like that in effect at Prudential to your

4    knowledge, right?

06:35 5         MR. BLACK:  Objection.  Vague and ambiguous as

6    to "incentive payments" as characterized by counsel.

7    Vague as to time.  Overbroad.

8         THE WITNESS:  I don't know about anywhere else.

9    I just know here in the Agoura Hills office that was not

06:35 10   something offered to us.

11   BY MR. MEER:

12        Q   Your pay, from what you were told, was not

13   dependent on the number of calls you handled or the

14   number of claims you handled, right?

06:36 15        A   Yes.  That's correct.

16        Q   And as far as you know, there was no program in

17   effect at Prudential to pay employees based on the number

18   of calls they handled or the number of claims they

19   handled, right?

06:36 20        A   I'm sorry.  Can you ask me that again?

21        Q   There was no program at any facility that you're

22   aware of that paid based on the number of calls handled

23   or the number of claims handled, right?

24        A   I can only answer for the office that I worked

06:36 25   in.  I don't know about the other offices.  But no, we

Exhibit A, Page 64

285

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010
Witness:  Dominique Osborne

1

2

3

4

5

6

7

8

9          I, DOMINIQUE OSBORNE, do hereby declare under

10    penalty of perjury that I have read the foregoing

11    transcript; that I have made any corrections as appear

12    noted, in ink, initialed by me; that my testimony as

13    contained herein, as corrected, is true and correct.

14          EXECUTED this _____ day of _____,

15    20_____, at _____, _____.
                           (City)                        (State)

16

17

18          _____
              DOMINIQUE OSBORNE

19

20

21

22

23

24

25

Dominique Osborne vs. The Prudential Insurance Company of America                    Date Taken: 7/6/2010

Witness: Dominique Osborne

1

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby certify:

5          That the foregoing proceedings were taken before

6    me at the time and place herein set forth; that any

7    witnesses in the foregoing proceedings, prior to

8    testifying, were duly sworn; that a record of the

9    proceedings was made by me using machine shorthand which

10   was thereafter transcribed under my direction; that the

11   foregoing transcript is a true record of the testimony

12   given.

13         Further, that if the foregoing pertains to the

14   original transcript of a deposition in a Federal Case,

15   before completion of the proceedings, review of the

16   transcript [X] was [ ] was not required.

17        I further certify I am neither financially

18   interested in the action nor a relative or employee of

19   any attorney or party to this action.

20        IN WITNESS WHEREOF, I have this day subscribed

21   my name.

22   Dated:  July 8, 2010

23

24                ANDREA M. RINKER

                    CSR No. 13437

25

Exhibit A, Page 66

299