1   JON D. MEER (State Bar No. 144389)
    jmeer@seyfarth.com
2   SIMON L. YANG (State Bar No. 260286)
    syang@seyfarth.com
3   **SEYFARTH SHAW LLP**
    2029 Century Park East, 35th Floor
4   Los Angeles, California   90067-3021
    Telephone:   (310) 277-7200
5   Facsimile:   (310) 201-5219

6   LORIE E. ALMON (*admitted pro hac vice*)
    lalmon@seyfarth.com
7   **SEYFARTH SHAW LLP**
    620 Eighth Avenue, 32nd Floor
8   New York, New York  10018
    Telephone:  (212) 218-5500
9   Facsimile:   (212) 218-5526

10  Attorneys for Defendant
    THE PRUDENTIAL INSURANCE
11  COMPANY OF AMERICA, INC.

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14                   **WESTERN DIVISION**

| | |
|---|---|
| 15  DOMINIQUE OSBORNE, on her own behalf and on behalf of Aclass of similarly situated persons pursuant to F.R.C.P. 23 and 23 U.S.C. §216, and on behalf of the General Public, | Case No. CV10-2465 JFW (CWx) |
| | *The Hon. John F. Walter* |
| 17 | **EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE CITED IN DEFENDANT PRUDENTIAL INSURANCE COMPANY OF AMERICA, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| 18            Plaintiffs, |
| 19        v. |
| 20  THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, A New Jersey Corporation, |
| 21 |
| 22            Defendant. |
| 23 | Date:            December 6, 2010 |
| | Time:            1:30 p.m. |
| | Courtroom:     16 |
| 24 | |
| 25 | Complaint Filed:   April 5, 2010 |
| | Discovery Cutoff: March 1, 2011 |
| 26 | Motion Cutoff:    March 28, 2011 |
| | Pre-Trial Conf.:   May 6, 2011 |
| | Trial Date:        May 24, 2011 |

1   TO PLAINTIFF, DOMINIQUE OSBORNE, AND HER COUNSEL OF

2   RECORD, TEEPLE HALL, LLP:

3       PLEASE TAKE NOTICE that Defendant Prudential Insurance Company of

4   America, Inc. ("Defendant") hereby submits the following Excerpts From The

5   Deposition Of Plaintiff Dominique Osborne cited In Defendant's Memorandum Of

6   Points And Authorities In Support Of Its Motion For Summary Judgment.

7

8   DATED: November 8, 2010          **SEYFARTH SHAW LLP**

9

10                                  By:  _____/s/ Jon D. Meer_____
                                            JON D. MEER
11                                  Attorneys for Defendant
                                    THE PRUDENTIAL INSURANCE
12                                  COMPANY OF AMERICA, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXCERPTS FROM DEPOSITION OF DOMINIQUE OSBORNE CITED IN DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

1. Plaintiff's Depo., 11:20-12:8:

   Q  You started work on August 21st, 2008 and your employment ended on -- to July 17th, 2009, correct?

   A  I want to say it was before August 21st, but it in August.

   Q  August 2008, right?

   A  Yes. That's correct.

   Q  And your employment ended on July 17th, 2009, right?

   A  I'm not sure of the exact date, but I know it was in July.

   Q  And during the time that you were working for Prudential, you worked at their Agoura Hills location, correct?

   A  Yes. That's correct.

2. Plaintiff's Depo., 17:21-25:

   Q  At any time.

   A  Only really when I was hired there.

   Q  And you left 21st Century Insurance Company voluntarily, correct?

   A  Yes.

3.  Plaintiff's Depo., 23:9-14:

    Q  And the shift when you were working at
       the company began at 8:00 a.m. and ended
       at 4:00 p.m., correct?

    MR. BLACK:   Objection. Assumes facts not
       in evidence.

    THE WITNESS: Yes.

4.  Plaintiff's Depo., 23:21-24:20:

    Q  Sure. The shift starting and stopping
       time -- 8:00 a.m. to 4:00 p.m. -- that
       was automatically recorded by the
       company without you having to punch a
       time clock or fill out a time card,
       right?

    A  Yes. That's correct.

    Q  And the shift when you were working at
       the company began at 8:00 a.m. and ended
       at 4:00 p.m., correct?

    MR. BLACK:   Objection. Assumes facts not
       in evidence.

    THE WITNESS: Yes.

    Q  And as part of your regular shift from
       8:00 a.m. to 4:00 p.m., you received a
       30-minute lunch break, correct?

    MR. BLACK:   Objection. Vague and
       ambiguous as to "received."

    THE WITNESS: Yes. That's correct.

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1      BY MR. MEER:

2      Q  You took 30 minutes for lunch every day,

3         right?

4      MR. BLACK:   Objection. Vague and

5         ambiguous. Overbroad. Vague as to time.

6      THE WITNESS: Yes. That's correct.

7      BY MR. MEER:

8      Q  And so as part of your regular work

9         shift from 8:00 a.m. to 4:00 p.m., you

10        had 30 minutes of an unpaid lunch and

11        the remaining seven and a half hours

12        were paid, correct?

13     MR. BLACK:   Objection. Vague and

14        ambiguous as to "paid." Overbroad.

15        Compound. Do you understand the

16        question?

17     THE WITNESS: Yes, yes. Yes, that's

18        correct.

19   5.  Plaintiff's Depo., 25:3-26:2:

20     Q  There were two ten-minute breaks that

21        you were allowed to take every day,

22        correct?

23     A  Yes. That's correct.

24     Q  And there was a third block of ten

25        minutes where you were allowed to do

26        whatever you wanted and not have to

27        perform work activities, correct?

28

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1       MR. BLACK:   Objection. Assumes facts not

2           in evidence. Vague and ambiguous.

3           Leading. Overbroad. Compound.

4       THE WITNESS: Yes, if you needed, for

5           example, to use the rest room.

6       BY MR. MEER:

7       Q  And so you understood during the time

8           that you worked at Prudential you were

9           responsible for seven hours of

10          performing work each day, you had three

11          breaks totaling 30 minutes and one lunch

12          period totaling 30 minutes, correct?

13      MR. BLACK:   Objection. Calls for a legal

14          conclusion. Misstates prior testimony.

15          Vague and ambiguous.

16      THE WITNESS: Well, really -- it wasn't

17          fully an hour unless you did have to use

18          the bathroom. So really, I guess with

19          the -- the ten minutes extra or what

20          have you -- I mean, it was just used if

21          you needed to use it, but not always

22          every single day.

23    6.   Plaintiff's Depo., 26:16-21:

24       Q  You were told that you would have two

25          ten-minute breaks during each workday,

26          correct?

27       A  Yes. That's correct.

28

1    Q  And you were always allowed to take two
2       ten-minute breaks each workday, right?
3    A  Yes, I was.
4    7.  Plaintiff's Depo., 34:14-22:
5    Q  And at the call center where you worked,
6       there were approximately 14 hourly
7       employees?
8    MR. BLACK:   Objection. Vague and
9       ambiguous. Vague as to "hourly
10      employees." Calls for a legal opinion.
11   THE WITNESS: Well, there was more than 14
12      employees that worked in the call
13      center. There was other people that did
14      different things that were not all --
15      not everyone was on the phone.
16   8.  Plaintiff's Depo., 38:21-39:2:
17   Q  But when you recorded the total amount
18      of time you worked on a particular day --
19   A  Mm-hmm.
20   Q  -- that was always accurate, correct?
21   MR. BLACK:   Objection. Calls for a legal
22      conclusion. Vague and ambiguous.
23   THE WITNESS: I would say yes.
24   9.  Plaintiff's Depo., 45:6-13:
25   Q  You didn't want to work overtime as
26      well, correct?
27   A  Yes. That's correct.
28

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1     Q  So if overtime had been offered to you

2        and it was voluntary, you would have

3        declined?

4     MR. BLACK:    Objection. Calls for

5        speculation.

6     THE WITNESS: Yes. That's correct. I would

7        have declined.

8   10.  Plaintiff's Depo., 48:3-23:

9     Q  And some people were assigned to the

10       activity of handling claims, correct?

11     A  Well, yes. There was people that -- that

12       strictly were just doing claims, but you

13       can also be on phone working because we

14       were always having to multi-task and

15       work on claims as well.

16     Q  But there were some people who didn't

17       wear a headset during some part of the

18       day and they only worked on claims and

19       didn't take any calls, right?

20     MR. BLACK:    Objection. Misstates prior

21       testimony. Vague and ambiguous and

22       misleading.

23     THE WITNESS: Yes. That's correct.

24     Q  And there were some people who also

25       during some part of the day handled

26       administrative issues, paperwork,

27       correspondence, things like that?

28

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1        MR. BLACK:   Objection. Assumes facts not

2          in evidence.

3        THE WITNESS: Yes. That's correct.

4        BY MR. MEER:

5        Q  And these activities -- just to use

6          shorthand so that we're both talking

7          about the same thing, I'm going to refer

8          to as "handling calls," and you

9          understand those are the people who are

10       wearing headsets and either talking to

11       callers that come in or waiting for

12       callers that come in. Is that a fair

13       description of it?

14       A  Yes.

15       Q  Okay. And people who are handling claims

16       are not wearing a headset, they are

17       handling the claims process and matching

18       up the claims with the proper payments

19       to be paid, correct?

20       MR. BLACK:   Objection. Misstates prior

21       testimony. Vague and ambiguous and

22       misleading.

23       THE WITNESS: I would have to disagree

24       because if we got busy all of a sudden,

25       everybody who was doing claims -- you

26       could keep your headset on all day

27       because it was unpredictable because of

28       being a call center. So they could be

1                required to jump on the phones in the

2                middle of doing a claim. So everyone was

3                -- the job that was trained to do claims

4                was also trained to be on the phone at

5                any moment's notice.

6    11. Plaintiff's Depo., 50:19-51:5:

7         Q  And those three activities were in a

8            constant state of change throughout the

9            day depending on call volume or claim

10           volume, correct?

11       A  Yes. That's correct.

12       Q  So if the call volume was particularly

13          high, then more people were handling

14          calls than if the call volume was

15          particularly low, right?

16       A  Yes. That's right.

17       Q  People moved from handling calls to

18          handling claims or to handling

19          correspondence throughout the same day,

20          right?

21       A  Yes. That's right.

22    12. Plaintiff's Depo., 71:20-23:

23         Q  …[D]id you ever say to a supervisor or

24           manager, you know, "I stayed beyond my

25           shift ending time today, how should I

26           record or am I allowed to record the

27           extra time worked?"

28

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1       A  No. No, I didn't go ahead and push the

2          subject.

3   13.  Plaintiff's Depo., 93:18-23:

4       Q  Okay. If you were to look through them,

5          would you be able to spot specific days

6          that you think are not accurate?

7       A  No. No. Realistically, I don't know who

8          could do that. I know I can't, so no. I

9          wouldn't be able to say which days are

10         not accurate.

11  14.  Plaintiff's Depo., 95:10-12:

12      Q  Did you ever keep any separate set of

13         records on your own showing the times

14         that you arrived at work?

15      A  No, I didn't.

16  15.  Plaintiff's Depo., 96:13-97:3:

17      Q  On some days you got to the office at

18         only a couple of minutes before your

19         shift started, correct?

20      MR. BLACK:   Objection. Assumes facts not

21         in evidence. Misstates prior testimony.

22         Lacks foundation.

23      THE WITNESS: Yes. That's correct.

24      BY MR. MEER:

25      Q  And on some days you got to the office

26         after your shift started, correct?

27      MR. BLACK:   Objection. Also vague and

28         ambiguous as to "office."

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1    THE WITNESS: Yes. Yes. That could happen
2        as well.
3    BY MR. MEER:
4    Q  And on some days, you got to the office
5        exactly at the time that your shift
6        started, correct?
7    A  Yes. That's correct.
8    16. Plaintiff's Depo., 98:17-99:2:
9    Q  Well, even though they may have
10       requested you to show up earlier, you
11       were never disciplined or demoted or had
12       your pay cut or in any way counseled
13       about the time that you arrived at the
14       office, right?
15   MR. BLACK:   Objection. Asked and
16       answered. Misstates prior testimony.
17   THE WITNESS: No.
18   BY MR. MEER:
19   Q  You never received any of that
20       discipline or counseling?
21   A  No. No, I didn't.
22   17. Plaintiff's Depo., 111:19-112:1:
23   Q  So is there any day specifically when
24       you can remember the time you stopped
25       working?
26   MR. BLACK:   Again, objection. Vague and
27       ambiguous as to whether "specifically"
28

| | |
|---|---|
| 1 | is being used or referring to a specific |
| 2 | day or a specific time on any day. |
| 3 | THE WITNESS: No. I cannot tell you for a |
| 4 | specific day, no. |
| 5 | 18. Plaintiff's Depo., 146:21-147:8: |
| 6 | Q Sure. This is a daily production report |
| 7 | which is for your work beginning on |
| 8 | January 2nd, 2009. |
| 9 | A Mm-hmm. |
| 10 | Q And there are different types of |
| 11 | production -- |
| 12 | A Yes. |
| 13 | Q -- different types of work done. There's |
| 14 | claims, there's telephone -- |
| 15 | A Yes. |
| 16 | Q -- and then there's correspondence and |
| 17 | there's also nonproductive time, |
| 18 | vacations, PTO time, time spent in |
| 19 | meetings. And there is a sum of |
| 20 | production minutes for each of these |
| 21 | activities. |
| 22 | A Okay. |
| 23 | 19. Plaintiff's Depo., 149:25-150:2: |
| 24 | Q Okay. These daily production reports |
| 25 | were your requirement to log all work- |
| 26 | related activities? |
| 27 | A Yes. That's correct. |
| 28 | |

20. Plaintiff's Depo., 150:19-25:

        Q  Okay. And so looking at all of these
           dates, you filled in the amount of time
           spent on each of these different work-
           related activities per day, correct?

    MR. BLACK:   Objection. Document speaks
           for itself. Lacks foundation as to what
           the document even is.

    THE WITNESS: Yes. That's correct.

21. Plaintiff's Depo., 151:22-152:7:

        Q  This is the most accurate record that
           you're aware of showing the amount of
           time you spent during the day on
           different work activities, right?

    MR. BLACK:   Objection. Misstates prior
           testimony. It's leading. It's
           intentionally misleading. And it's
           confusing and it assumes facts not in
           evidence. Sorry.

    THE WITNESS: I would say it would probably
           be the closest thing to something being
           accurate as regards to some type of
           record kept for what we did for
           production throughout the day.

22. Plaintiff's Depo., 154:7-155:5:

        Q  So if we were to find this handwritten
           journal, the handwritten journal to your
           memory would include the same amount of

1      minutes that you entered electronically,

2      correct?

3   A  I would say yes. Sometimes I had

4      questions on them myself because you

5      could go a day or two, just get caught

6      up with doing -- doing your work and

7      stuff because this -- unfortunately with

8      doing these reports, it affected your

9      time to process -- process claims and

10     what have you and other things that we

11     were required to work on. But this is

12     the close -- the thing that comes the

13     closest to doing it and sometimes, you

14     know, you can do it every day or

15     sometimes some people would do them

16     weekly and just copy and enter it into

17     the system. Me personally, I try to do

18     it -- do it every -- every day or at

19     least every other day.

20  Q  The Prudential policy was to do it every

21     day, correct?

22  A  Yes. That's correct.

23  Q  And there is no other set of records

24     that you're aware of that would have a

25     more accurate representation of the

26     amount of time you spent on these

27     various daily activities, right?

28  A  No, not that I know of.

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1    23. Plaintiff's Depo., 160:25-161:7:

2    Q   And so this wasn't a system where

3        someone was just supposed to routinely

4        record seven hours a day, they were

5        supposed to record the actual amount of

6        time spent, right?

7    MR. BLACK:    Objection. Vague and

8        ambiguous as to "time spent." Asked and

9        answered and misstates prior testimony.

10   THE WITNESS: Yes. That's correct.

11   24. Plaintiff's Depo., 165:15-18:

12   A   Okay. Well, it wouldn't be every day,

13       but I mean that I stayed, I mean, 15, 20

14       minutes later. But, I mean, on average,

15       I left anywhere from 4:07 to 4:15 each

16       day.

17   25. Plaintiff's Depo., 166:19-167:6:

18   Q   …[H]ow much extra time did you work on

19       the worst day?

20   A   On the worst day? I would say it could

21       be up to like 13, 15 minutes.

22   Q   Okay. And if this was the worst case

23       scenario week -- let's say 15 minutes of

24       extra time worked each day without being

25       paid -- that would be 15 minutes times

26       five days a week, right?

27   A   Yes.

28   Q   You never had to work weekends, right?

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1    A  No, I didn't have to work weekends.

2    Q  You were always on a five-day week?

3    A  Yes. That's correct.

4    26. Plaintiff's Depo., 167:17-21:

5    Q  It is a complex question, I guess. So

6       you were working the worst amount of

7       uncompensated time every day of the

8       workweek, that would be 15 minutes per

9       day or 1 hour and 15 minutes per week,

10      right?

11   A  Yes, roughly about that.

12   27. Plaintiff's Depo., 168:11-13:

13   Q  And so you automatically got paid for 37

14      1/2 hours per week, right?

15   A  Yes

16   28. Plaintiff's Depo., 169:8-16:

17   Q  Okay. So 37 1/2 -- we add the hour.

18      That's 38. And then we add the extra 15

19      minutes. That makes it 38 hours and 45

20      minutes.

21   A  Yes.

22   Q  So instead of being paid 37 1/2 hours

23      per week on the worst weeks when you

24      were working the most time without being

25      paid, you should have been paid 38 hours

26      and 45 minutes per week?

27   A  Yes. That's correct.

28

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

29. Plaintiff's Depo., 192:23-193:3:

   Q   And the telephone queue -- how long did
       it take to load into that assuming no
       human error, that you remembered the
       password, that you were able to type at
       a regular speed, all of that?

   A   It probably took about 15, 20 seconds.
       It didn't take that long.

30. Plaintiff's Depo., 193:11-19:

   Q   And the Pride system -- how long did
       that take to logon to?

   A   That could take some time. It could take
       five minutes, sometimes seven minutes.
       It took a long time.

   Q   And what percentage of the time in the
       morning did you have to logon to the
       Pride system?

   A   I would say probably maybe a good 30, 40
       percent.

31. Plaintiff's Depo., 194:16-24:

   Q   So on the dates when you had to begin
       your shift on telephones, the majority
       of the time it was Lotus Notes which
       could take up to two minutes, the
       telephone queue IP Agent which would
       take 15 or 20 seconds, the ABC system
       which could take a minute to a minute
       and a half, and the CFE system which

1          could take two to three minutes; is that

2          right?

3     A  Yes. That's right, yes, to get all of

4          these systems up, yes.

5  32. Plaintiff's Depo., 202:6-11:

6     Q  And so in order to be considered logged

7          on by 8:00 a.m., you might still be

8          logging on to programs after 8:00 a.m.,

9          right?

10    MR. BLACK:   Objection. Vague and

11         ambiguous as to what "logged on" means.

12    THE WITNESS: Yes. That's correct.

13 33. Plaintiff's Depo., 203:21-204:4:

14    Q  But if somebody was following the policy

15         articulated at the call center where you

16         worked, they could have logged on to

17         just one of those systems by 8:00 a.m.

18         and then logon to the other systems

19         after 8:00 a.m., right?

20    MR. BLACK:   Objection. The question is

21         vague and ambiguous. It's compound and

22         it's intentionally misleading.

23    THE WITNESS: Yes. That's true.

24 34. Plaintiff's Depo., 205:2-6:

25    Q  Sure. If the telephone queue took 15 to

26         20 seconds to logon to, then if somebody

27         arrived 30 seconds before 8:00 a.m.,

28

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1      they could be logged on to the telephone

2      queue at 8:00 a.m.?

3      A  Yes.

4   35. Plaintiff's Depo., 205:13-15:

5      Q  And you could login to those other

6         computer systems after 8:00 a.m., right?

7      A  Yes. You could go ahead and do that.

8

9

10  36. Plaintiff's Depo., 206:11-25:

11     Q  But if you could logout of the systems

12        in whatever sequence or order you wanted

13        to -- if you wanted to avoid calls that

14        went after 4:00, the first thing you

15        would logout of would be IP Agent

16        because once you're out of that you're

17        out of the call queue, right?

18     MR. BLACK:    Objection. Assumes facts not

19        in evidence. Incomplete hypothetical.

20        Calls for speculation and is misleading.

21     THE WITNESS: You could basically -- you

22        wouldn't even necessarily have to

23        logout. You can stay into -- I forget

24        what it was called there. It might have

25        been like "not ready" or "wrap up" or

26        something like that to where you could

27        still be in the system but where you

28        block from not getting anymore phone

1                calls while you're wrapping up your

2                work.

3   37. Plaintiff's Depo., 210:22-211:2:

4          Q  And on days when it didn't freeze and

5             things logged out correctly, it could be

6             done in less than two minutes?

7          MR. BLACK:   Objection. Misstates prior

8             testimony.

9          THE WITNESS: I would say within three

10            minutes.

11   38. Plaintiff's Depo., 214:3-11:

12         Q  On days where you were not on a call,

13           you could start logging out at 3:50

14           p.m., right?

15         A  Yeah. I mean, we still -- we had to go

16           ahead and, you know, finish our work or,

17           you know, pretty much just get any

18           paperwork we had organized, put back in

19           our desk or what have you, start logging

20           out of your systems if we didn't have a

21           phone call or whatever. But Prudential

22           always made sure they could squeeze

23           every minute out of you.

24   39. Plaintiff's Depo., 224:22-225:1:

25         Q  And just to get an accurate pay rate on

26           there, on page 2 of this, it indicates

27           that you had a pay rate of $19.48. Is

28           that accurate?

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1        A  Yes. It looks like it's 48. It looks

2           like 49 on one of them, but it's a

3           penny.

4    40. Plaintiff's Depo., 228:9-16:

5        Q  On the dates when you were three minutes

6           or five minutes or ten minutes late, you

7           never told any supervisor or manager to

8           adjust your time, right?

9       MR. BLACK:   Objection. Intentionally

10          misleading. Lacks foundation. It's

11          argumentative. Assumes facts not in

12          evidence and is intended to intimidate

13          the witness.

14       THE WITNESS: No, I didn't ask anyone.

15    41. Plaintiff's Depo., 238:14-16:

16        Q  And the Prudential electronic intranet

17           system also had a section on payroll and

18           overtime, correct?

19        A  I'm sure it did. I didn't review it,

20           though.

21    42. Plaintiff's Depo., 240:1-3:

22        Q  You are sure that there was a policy

23           regarding payroll and timekeeping,

24           right?

25        A  Yes.

26    43. Plaintiff's Depo., 241:23-242:5:

27        Q  But based on your understanding that

28           overtime was over 40 hours a week, there

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

1                were not weeks at Prudential when you

2                worked over 40 hours, correct?

3          MR. BLACK:   Objection. Calls for a legal

4                and expert opinion. Assumes facts not in

5                evidence. Misstates prior testimony.

6          THE WITNESS: No, I didn't work over 40

7                hours a week at Prudential.

8       44. Plaintiff's Depo., 249:16-250:2

9         Q But you understood at Prudential that if

10           you had wanted to try to navigate to

11           find out who the appropriate person is

12           for payroll issues or human resources

13           issues, there were resources to find

14           those people, right?

15         MR. BLACK: Objection. Asked and answered.

16           It's argumentative. Federal law

17           controls.

18         THE WITNESS: It's just something to where I

19           -- I didn't want to be, I guess, going

20           behind someone's back or questioning

21           somebody's authority, considering

22           everything that we were going through on

23           a day-to-day basis. So it was just

24           something that I just -- I just left

25           alone even though I saw that it wasn't

26           right.

27

28

EXCERPTS FROM DEPOSITION OF PLAINTIFF DOMINIQUE OSBORNE

45. Plaintiff's Depo., 284:24-285:10:

      Q  Some call centers have an incentive program where they pay an employee per call. The employee gets a base wage and then maybe a dollar or a couple of dollars for each call that they complete. There wasn't any program like that in effect at Prudential to your knowledge, right?

MR. BLACK:   Objection. Vague and ambiguous as to "incentive payments" as characterized by counsel. Vague as to time. Overbroad.

THE WITNESS: I don't know about anywhere else. I just know here in the Agoura Hills office that was not something offered to us.